[No. A116420. First Dist., Div. Three. Sept. 20, 2007.]

JACQUELINE T. et al., Plaintiffs and Appellants, v.
ALAMEDA COUNTY CHILD PROTECTIVE SERVICES et al.,
Defendants and Respondents.

458

## COUNSEL

Ajalat & Ajalat and Stephen P. Ajalat for Plaintiffs and Appellants.

Haapala, Altura, Thompson & Abern, Rebecca S. Widen for Defendants and Respondents.

## OPINION

**HORNER, J.**[*]—This is an appeal from a judgment entered in favor of respondents Alameda County Child Protective Services (County) and two of its employees, Michael Yee and Paula Richards (collectively, Employees). Appellant Jacqueline T., individually and as guardian ad litem for minors Roes 1 through 3 (collectively, Minors), filed a complaint alleging several causes of action sounding in negligence and negligence per se based on Employees' conduct in investigating reports of possible sexual abuse of Minors.

Respondents moved for summary judgment, which the trial court denied. Respondents then filed a petition for a writ of mandate or prohibition in this court, which we granted after concluding respondents were immune from liability under Government Code section 820.2 and/or section 821.6. Complying with the alternative writ, the trial court vacated its order denying

---

[*]Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

respondents' summary judgment motion and entered a new order granting the motion.

On appeal, Jacqueline T. raises essentially the same arguments she relied upon in opposing summary judgment and the petition for a writ of mandate or prohibition. And for the same reasons we rejected her arguments previously, we reject them here. The judgment will thus be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Jacqueline T. is mother to Minors with her former husband, Albert G. (collectively, parents). After they divorced, parents shared joint custody of Minors, while primary physical custody remained with Jacqueline T. Minors routinely had weekend visits with Albert G. at the house he shared with his girlfriend, Kelly D., and her 11-year-old son, N. On three occasions—in 1998, 1999, and 2000—County received reports alleging that N. was sexually abusing Roes 1 and 2 during their weekend visits with Albert G.

The first report was submitted on August 27, 1998, by Minors' therapist, Dr. Clark Conant. According to the report, Dr. Conant informed County that, during a visit to his office, Roe 2 screamed when using the toilet. Jacqueline T. then examined Roe 2 and found redness in her vaginal area. When asked about the redness, Roe 2 explained she "hate[s] N." because "he sits on me and kisses me." Roe 1 then said that N. asked Roe 2 to kiss Roe 1 and to suck his penis.

After receiving the report, County immediately completed an emergency response unit child protective services (CPS) intake form and screener narrative, and the matter was referred to respondent Michael Yee, a County social worker, for investigation. During his subsequent investigation, Yee, among other things, contacted Jacqueline T.; prepared a history; visited the homes of both Jacqueline T. and Albert G.; conducted interviews of N., N.'s mother and siblings, and Minors; and spoke by telephone with Albert G.[1] In addition, on September 26, 1998, Yee cross-reported the alleged abuse to the Newark Police Department, which decided not to pursue any action at that time. Ultimately, Yee concluded in a written investigative narrative that the

---

[1] Sometime later in 1998, Jacqueline T. was advised by a friend, Laura N., that Roe 2 said her "pee pee" hurt because "N." touches her there. Jacqueline T. told Laura N. that County was already investigating the alleged abuse, which had been reported by Minors' therapist, and requested that she call County to give this new information to the social worker in charge of the investigation. Laura N. did so, speaking to a man whose name she did not recall and giving him her phone number in case he later had questions. Laura N. did not hear from the man again.

child abuse allegations were unsubstantiated, noting in doing so that parents were engaged in a "messy child custody fight."

The second report was submitted on October 29, 1999, by Minors' maternal great-grandmother. According to this report, Roe 2 told her great-grandmother during a bath to "lick her bootie." When the great-grandmother asked Roe 2 where she learned to say that, Roe 2 said from N.

Again, after receiving the report, County immediately conducted an emergency response unit CPS intake form and screener narrative, and the matter was referred to respondent Paula Richards, another County social worker, for investigation. During Richards's subsequent investigation, she reviewed the file from Yee's investigation the prior year, and noted that the screener narrative identified the new allegations as substantially similar to the earlier ones that Yee had found unsubstantiated. Richards spoke several times by telephone with Jacqueline T. and attempted a home visit, but no one answered the door. She also obtained authorization from Jacqueline T. to speak to Minors' family court therapist, and thereafter spoke to the therapist several times.

Like Yee, Richards also cross-reported the alleged abuse to the Newark Police Department. In doing so, Richards spoke to the officer assigned to the case, Detective Ramirez, who informed her that she was familiar with the family and had decided against pursuing a criminal investigation at that time, noting the family was dealing with several custody issues.

Ultimately, Richards deferred further investigation due in part to the ongoing and contentious family court proceedings and mediation. But Richards kept the matter open until 2000, when the third report of suspected abuse was received.

The third report on June 29, 2000, was again submitted by Minors' maternal great-grandmother, and then referred to Richards upon the immediate completion of an emergency response unit CPS intake form and screener narrative. In the third report, the great-grandmother stated, among other things, that Roe 1 had told her N. was "gay," and when she asked him to explain why he believed this, Roe 1 had explained N. pulls his own and Roe 1's pants down and puts his private part on Roe 1 and in his face. The great-grandmother also reported that, when Jacqueline T. asked Roe 2 whether anyone had touched her private parts, she replied: "N. sometimes touches me with my pants off and my pants on." Roe 2 further told her: "I hate going there [to N.'s house] every time he does it, and I don't like it."

Jacqueline T. then asked Roe 1 whether N. touched his private parts, and he responded, "not me, just [Roe 2]."

In response to the third report, Richards again cross-reported to the Newark Police Department, speaking to Detective Ramirez on July 7, 2000. County, in conjunction with the Newark Police Department and the Alameda County District Attorney's Office, then arranged for Child Abuse Listening, Interviewing and Coordination Center (CALICO) interviews of Roes 1 and 2, which were conducted one-on-one by a forensic child interviewer on July 13, 2000.

Ultimately, all three agencies—County, the Newark Police Department and the Alameda County District Attorney's Office—concluded based on the evidence that the sexual abuse allegations were unsubstantiated. Thereafter, Richards concluded in a written investigative narrative that nothing the children said during the CALICO interviews indicated they had been sexually abused, and that their encounters with N., including one in which, according to Roe 1, N. "put his dick—his private part on my face," were best described as "horseplay."[2] Richards thus closed the case file.

Sometime after the case was closed, N. admitted sexually molesting Roes 1 and 2. And during subsequent CALICO interviews, the children revealed much more specific evidence of N.'s abuse. N. was thus criminally charged for the abuse and detained in a juvenile detention facility.

On June 8, 2004, Jacqueline T. filed this lawsuit, asserting causes of action for (1) child endangerment/negligence per se, (2) statutory violations/negligence per se, (3) negligence, and (4) negligent hiring, supervision and retention. After two rounds of amendments, respondents demurred to the second amended complaint on the ground that they were immune from liability under Government Code sections 821.6 and 820.2. The trial court overruled the demurrer. Respondents then moved for summary judgment on the same ground, which the trial court also denied.

On June 26, 2006, respondents filed a petition for writ of mandate or prohibition in this court, challenging the trial court's denial of their motion for summary judgment. After permitting informal briefing, this court issued an alternative writ of mandate directing the trial court to set aside and vacate its order denying summary judgment and to enter an order granting the motion. Alternatively, this court ordered the trial court to show cause why it should not be compelled to comply with the alternative writ.

---

[2] During the CALICO interview, Roe 2 denied N. had sexually contacted or abused her, but described him as "really mean."

On August 11, 2006, the trial court complied with the alternative writ, issuing an order granting summary judgment to respondents. This court thus discharged the alternative writ and summarily denied the petition as moot. As such, no formal briefing was ordered, and the matter never came on calendar for hearing. Respondents have included the alternative writ as exhibit B to respondents' brief. (*Alameda County Child Protective Services v. Superior Court* (Aug. 3, 2006, A114230) [order issuing alternative writ].)

On September 12, 2006, Jacqueline T. filed a petition for review in the California Supreme Court, which was denied. On October 18, 2006, judgment was entered in favor of respondents, leading to this appeal.

## DISCUSSION

Summary judgment shall be granted if all the papers submitted show there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law. We review this question of law independently. (Code Civ. Proc., § 437c, subd. (c); *Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1449–1450 [16 Cal.Rptr.2d 320].) In doing so, however, "we must view the evidence in a light favorable to . . . the losing party [citation], liberally construing [his] evidentiary submission while strictly scrutinizing [the prevailing party's] own showing, and resolving any evidentiary doubts or ambiguities in [the losing party's] favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; see *Barton v. Elexsys Intern., Inc.* (1998) 62 Cal.App.4th 1182, 1187–1188 [73 Cal.Rptr.2d 212].)

Here, summary judgment was granted on the ground that, as a matter of law, respondents are immune from liability for alleged negligence and negligence per se in connection with reporting, investigating and cross-reporting allegations that Roes 1 and 2 had been sexually abused. Jacqueline T. contends this grant of summary judgment on immunity grounds was erroneous because respondents' alleged investigatory failures amounted to breaches of "mandatory and ministerial" duties.

This court has once before addressed the issue of respondents' immunity under California law. As set forth above, in issuing an alternative writ of mandate ordering the trial court to grant summary judgment in favor of respondents, we concluded both County and Employees were immune from liability under two statutes—Government Code sections 821.6 and/or 820.2. In so concluding, we reasoned that "the investigation of allegations of child abuse and the decision of what action, if any, should be taken are uniquely

governmental functions. [Fn. omitted.] A decision to remove a child from his/her home or not to do so and the investigation that informs that decision involve precisely the kinds of 'sensitive policy decision[s] that require[] judicial abstention to avoid affecting a coordinate governmental entity's decisionmaking or planning process.' (*Barner* [*v. Leeds* (2000) 24 Cal.4th 676,] 688 [102 Cal.Rptr.2d 97, 13 P.3d 704].)"

Despite having previously explained via the alternative writ our conclusion that respondents are entitled to immunity, we consider the issue anew on appeal, given that we summarily denied respondents' writ petition as moot, without ordering formal briefing or giving the parties the opportunity for oral argument, when the trial court complied with the writ. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 894, 899 [12 Cal.Rptr.2d 728, 838 P.2d 250] [where a respondent to a petition for writ of mandate chooses to act in conformity with the alternative writ, the petition becomes moot and there is no cause to be decided by the Court of Appeal in a written opinion].) We therefore turn again to the relevant law.

Under the California Tort Claims Act, Government Code section 810 et seq.,[3] "[e]xcept as otherwise provided by statute: [¶] (a) A public entity *is not* liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."[4] (§ 815, subd. (a), italics added; Stats. 1963, ch. 1681, § 1, pp. 3266, 3268.) "The liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person." (§ 815, subd. (b).)

Here, Jacqueline T. sets forth two statutory bases for holding respondents liable under the California Tort Claims Act. First, Jacqueline T. seeks to hold County derivatively liable for the alleged acts or omissions of Employees under section 815.2. Second, she seeks to hold County directly liable for alleged acts or omissions under section 815.6. We address each claim in turn.

A. *Liability Under Section 815.2.*

"A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." (§ 815.2, subd. (a); Stats. 1963, ch. 1681, § 1, pp. 3266, 3268.) "Except as

---

[3] All references to a particular code section are to the section in effect on the date when the relevant conduct allegedly occurred.

[4] Unless otherwise stated, all statutory citations herein are to the Government Code.

otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (§ 815.2, subd. (b); Stats. 1963, ch. 1681, § 1, pp. 3266, 3268.)

Here, Jacqueline T. seeks to hold County derivatively liable for Employees' alleged acts or omissions in investigating allegations that Roes 1 and 2 had been sexually abused. Respondents, in turn, argue Employees, and thus County, are immune from such liability under section 820.2 and section 821.6. Section 820.2 provides: "A public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Section 821.6, in turn, provides: ". . . a public employee is not liable for injury caused by his [or her] instituting or prosecuting any judicial or administrative proceeding within the scope of his [or her] employment, even if he [or she] acts maliciously and without probable cause." (See Stats. 1963, ch. 1681, § 1, pp. 3266, 3269, 3270.)

 Our California Supreme Court has recently considered a claim of a public employee's so-called discretionary act immunity under section 820.2. In *Barner v. Leeds, supra*, 24 Cal.4th 676, the court concluded "not all acts requiring a public employee to choose among alternatives entail the use of 'discretion' within the meaning of section 820.2." (*Barner, supra*, 24 Cal.4th at pp. 684–685 (*Barner*).) Rather, immunity is limited to policy and planning decisions, and does not reach "lower level decisions that merely implement a basic policy already formulated." (*Id.* at p. 685.) "The scope of the discretionary act immunity 'should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.' " (*Ibid.*)

Applying this rule to the facts before it, the *Barner* court concluded a public defender's initial decision to provide representation to a criminal defendant was a "sensitive policy decision" subject to discretionary act immunity under section 820.2. (*Barner, supra*, 24 Cal.4th at p. 688.) A public defender's subsequent decisions in implementing that initial decision, such as decisions regarding the type and extent of legal services to provide the defendant, however, were "operational," i.e., related to policy implementation, and thus not subject to immunity under section 820.2. (24 Cal.4th at p. 688.)

Here, not surprisingly, Jacqueline T. argues Employees' alleged tortious acts were "operational decisions," and thus not immunized by section 820.2. She reasons that "[m]any of the decisions inherent to th[e] [investigatory] process"—including whether to accept a report of child abuse from a reporter,

whether to prepare an internal report and to timely cross-report to other agencies, whether to respond immediately, whether to utilize social workers skilled in emergency response, whether to interview certain individuals regarding the allegations or to have in-person contact with the alleged victim, and whether to take further actions to protect the victim—are "largely *operational* or *ministerial* decisions pertinent to the 'implementation' of those and other prescribed duties, as well as to the overall investigative function."

Several appellate courts, however, have rejected such reasoning. Those courts have held that a social worker's decisions relating to, as here, the investigation of child abuse, removal of a minor, and instigation of dependency proceedings, are discretionary decisions subject to immunity under section 820.2, and/or prosecutorial or quasi-prosecutorial decisions subject to immunity under section 821.6. (E.g., *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 882–883 [271 Cal.Rptr. 513] (*Alicia T.*) [county and its social workers held immune from liability under "either or both of [sections 820.2 and 821.6]" for alleged negligence in investigating report of child molestation]; *Jenkins v. County of Orange* (1989) 212 Cal.App.3d 278, 282–283 [260 Cal.Rptr. 645] (*Jenkins*) [county and its social workers held immune from liability under § 821.6 for "fail[ing] to use due care by not thoroughly investigating the child abuse report and fail[ing] to weigh and present all the evidence"]; *Newton v. County of Napa* (1990) 217 Cal.App.3d 1551, 1559–1561 [266 Cal.Rptr. 682] (*Newton*) [citing § 820.2 in holding county immune from liability for actions "necessary to make a meaningful investigation" of child abuse]; *County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 633, 644–645 [125 Cal.Rptr.2d 637] (*Terrel R.*) [county held immune from liability under § 820.2 for alleged negligent placement and supervision of child in foster home where child was sexually molested]; see also *Ronald S. v. County of San Diego* (1993) 16 Cal.App.4th 887, 899 [20 Cal.Rptr.2d 418] (*Ronald S.*) [county held immune from liability under § 821.6 for negligent selection of an adoptive home for a dependent child].) Such courts have reasoned that "[c]ivil liability for a mistaken decision would place the courts in the 'unseemly position' of making the county accountable in damages for a 'decision-making process' delegated to it by statute." (*Newton, supra,* 217 Cal.App.3d at p. 1560; see also *Ronald S., supra,* 16 Cal.App.4th at p. 897 ["[t]he nature of the investigation to be conducted and the ultimate determination of suitability of adoptive parents [by social workers] bear the hallmarks of uniquely discretionary activity"].)

*Alicia T.* is illustrative. There, the plaintiff argued, as Jacqueline T. does here, that a social worker's investigative decisionmaking is ministerial and not discretionary. Rejecting this argument, the court explained: "It is necessary to protect social workers in their vital work from the harassment of civil

suits and to prevent any dilution of the protection afforded minors by the dependency provisions of the Welfare and Institutions Code. Therefore, social workers must be absolutely immune from suits alleging the improper investigation of child abuse, removal of a minor from the parental home based upon suspicion of abuse and the instigation of dependency proceedings." (*Alicia T., supra*, 222 Cal.App.3d at p. 881.)

Similarly, relying on section 821.6, the court in *Jenkins* concluded a social worker was entitled to absolute immunity from liability arising out of her actions in investigating child abuse allegations, initiating dependency proceedings and removing a child from his custodial parent. (*Jenkins, supra*, 212 Cal.App.3d at pp. 283–284, 287.) In doing so, the court explained immunity under section 821.6 covers not just the act of filing a criminal complaint, but also other prosecutorial or quasi-prosecutorial functions such as weighing and presenting evidence when rendering a decision on whether to proceed with litigation. (*Jenkins*, at p. 284; see also *Kemmerer v. County of Fresno* (1988) 200 Cal.App.3d 1426, 1436–1437 [246 Cal.Rptr. 609]; *Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205, 1209–1210 [34 Cal.Rptr.2d 319] [concluding that "since investigation is part of the prosecution of a judicial proceeding" (*Amylou R.*, at p. 1211), acts committed in the course of the investigation are covered by § 821.6].)

■ Of course, particularly in light of our Supreme Court's decision in *Barner*, we would be remiss to interpret the case law as supporting the proposition that all actions by social workers involve policy or prosecutorial decisions falling within the scope of statutory immunity. On this point, *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 141 [32 Cal.Rptr.2d 643] (*Scott*), is illustrative. There, the court held a social worker could be held liable for negligent supervision of a foster child where she failed to comply with regulations requiring her to make monthly home visits to the child. (*Id.* at p. 142.) In doing so, the court reaffirmed *Alicia T.*'s holding that a social worker's decision to initiate dependency proceedings is a quasi-prosecutorial decision immunized by section 821.6. The court clarified, however, that the "actual delivery of public social services, such as foster care, to abused, neglected or exploited children," are actions governed by specific statutory or regulatory directives "which leave the officer no choice." (27 Cal.App.4th at pp. 143, 141.) As such, they would not be subject to immunity. (*Ibid.*)

*Newton* is also helpful. There, the court held a county was immune from liability for conduct relating to its investigation of reported child abuse, including " 'failing to properly, thoroughly and completely investigate the source and basis for the underlying [child abuse] complaint.' " (*Newton*, 217

Cal.App.3d at pp. 1561–1562 & fn. 5, italics omitted.) Immunity did not extend, however, "beyond actions implied in the decision to investigate" to "gratuitous actions, unnecessary for a proper investigation." (*Id.* at pp. 1560–1561.) The county was thus not immune for such gratuitous actions as causing the minors to disrobe and stand naked in the presence of strangers and failing to seek or receive voluntary consent to disrobe them. (*Id.* at p. 1562 & fn. 5.)

■ With this case law in mind, we turn to the facts before us. Unlike in *Scott*, we are not concerned with the actual delivery of public social services to abused, neglected or exploited children. Rather, we are concerned with social workers' preliminary determinations regarding whether such services, including removal, were in fact necessary. Moreover, unlike in *Newton*, Jacqueline T. makes no claim that Employees engaged in "gratuitous actions" unnecessary for a proper investigation. Rather, the alleged acts and omissions of which Jacqueline T. complains—including the failure to conduct a reasonable and diligent investigation and to timely cross-report to other agencies— were incidental to Employees' investigation, within the scope of their employment, of reports of possible abuse of Roes 1 and 2, and Employees' subsequent conclusion that such reports did not warrant initiation of dependency proceedings. (*Newton*, 217 Cal.App.3d at pp. 1561–1562 & fn. 5 [" 'failing to properly, thoroughly and completely investigate the source and basis for the underlying [child abuse] complaint' " (italics omitted) were not gratuitous actions unnecessary for a proper investigation].) As such, we conclude as a matter of law that Employees' alleged acts and omissions are covered by the broad grant of immunity section 821.6 affords to "[a public employee's] instituting or prosecuting any judicial or administrative proceeding within the scope of his [or her] employment" (§ 821.6), as well as the grant of immunity section 820.2 affords to sensitive policy decisions that result from a governmental entity's unique decisionmaking or planning process (§ 820.2; *Barner, supra*, 24 Cal.4th at p. 688).[5]

■ Further, because we conclude Employees are immune from liability for their alleged acts and omissions under sections 820.2 and 821.6, we conclude County is likewise immune. "Though sections 821.6 and 820.2 expressly immunize only the employee, if the employee is immune, so too is the County. (Gov. Code, § 815.2, subd. (b); *Kayfetz v. State of California*

---

[5] That Employees ultimately decided against initiating dependency proceedings does not render section 821.6 inapplicable. As both the statute and the case law make clear, the quasi-prosecutorial decision whether to initiate such proceedings—whatever that decision is—is immunized. (*Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1293 [89 Cal.Rptr.2d 60] [district attorney's conduct was an exercise of prosecutorial discretion immunized under § 821.6 even though he decided not to prosecute an action].)

(1984) 156 Cal.App.3d 491, 496 [203 Cal.Rptr. 33].)" (*Kemmerer v. County of Fresno, supra*, 200 Cal.App.3d at p. 1435.)

We thus turn to the issue of County's direct liability under section 815.6.

### B. *Liability Under Section 815.6.*

■ A public entity may be directly liable for failure to discharge a mandatory duty. Section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (See Stats. 1963, ch. 1681, § 1, pp. 3266, 3268.) ■ An enactment for purposes of section 815.6 may include both formal legislative measures, such as statutes, and quasi-legislative measures, such as regulations adopted by a state agency. (*Scott, supra*, 27 Cal.App.4th at pp. 134, 142.)

A public entity may *avoid* direct liability under section 815.6, as it may avoid derivative liability under section 815.2, by establishing that it has statutory immunity. Section 815, subdivision (b) provides: "[t]he liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person." Further, as set forth above, section 815.2, subdivision (b) provides: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (See Stats. 1963, ch. 1681, § 1, pp. 3266, 3268; see also *Kemmerer, supra*, 200 Cal.App.3d at p. 1435 ["[t]hough sections 821.6 and 820.2 expressly immunize only the employee, if the employee is immune, so too is the County"].)

Here, Jacqueline T. claims County may be held directly liable under section 815.6 for breach of mandatory duties imposed by the following enactments: (1) Penal Code section 11164 et seq.; (2) Penal Code section 11166, subdivisions (a), (f), and (i); (3) Penal Code section 11166.3; (4) Penal Code section 11165.7; (5) Penal Code section 11165.9; (6) Welfare and Institutions Code section 16501, subdivision (f); and (7) California Department of Social Services Manual of Policies and Procedures (DSS Manual) regulation 31-101.2.[6] We consider each claim below.

---

[6] In arguing that County and Employees breached certain mandatory duties in violation of section 815.6, Jacqueline T. relies in her opening brief on several enactments that she did not

(1) *Penal Code former section 11164 et seq. (Stats. 1987, ch. 1444, § 1.5, p. 5369.)*

Jacqueline T. contends Penal Code former section 11164 et seq., also known as the Child Abuse and Neglect Reporting Act (CANRA), imposed a mandatory duty on County and Employees to investigate suspected child abuse. Moreover, Jacqueline T. contends County and Employees breached this mandatory duty, not by failing to investigate the alleged abuse, but rather by failing to "reasonably and diligently" investigate it.

Former Penal Code section 11164 provided:

"(a) This article shall be known and may be cited as the Child Abuse and Neglect Reporting Act.

"(b) The intent and purpose of this article is to protect children from abuse. In any investigation of suspected child abuse, all persons participating in the investigation of the case shall consider the needs of the child victim and shall do whatever is necessary to prevent psychological harm to the child victim."[7]

■ As is clear from this language, the statute imposed no mandatory duty on County or Employees. Rather, the statute merely stated the Legislature's "intent and purpose" in enacting CANRA, an article composed of over 30 separate statutes. As such, former section 11164 provided no statutory basis for liability under section 815.6. (*Terrell R., supra*, 102 Cal.App.4th at p. 639 [an enactment creates a mandatory duty for purposes of § 815.6 only if "it requires a public agency to take a particular action. [Citation.] An enactment does not create a mandatory duty if it merely recites legislative goals and

---

rely upon before the trial court, including Penal Code sections 11165 and 11166, subdivision (i). Because Jacqueline T. failed to raise arguments based on these enactments below, we decline to consider them here. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].)

Jacqueline T. also concedes that certain enactments she relied upon in her opening brief—including California Code of Regulations, title 11, division 1, chapter 9, sections 901, 930.60 and 930.61—impose no mandatory duties on County. Given her concession, we do not address these enactments here.

Finally, Jacqueline T. concedes she relied on several DSS Manual regulations in her opening brief that "are substantially similar to and cumulative of other code sections that have been cited by plaintiffs, and [that] are also similar and mostly cumulative as between themselves," including regulations 31-110.3, 31-115, 31-120, 31-125.22 and 31-125.2. Again, given her concession, we do not address these cumulative regulations here.

[7] Penal Code section 11164 was amended effective January 1, 2001. (Stats. 2000, ch. 916, § 1.) References here to Penal Code section 11164 are to the statute as it read prior to amendment, when the alleged child abuse occurred.

policies that must be implemented through a public agency's exercise of discretion"].)

■ Moreover, to the extent Jacqueline T., in citing Penal Code former section 11164 generally, actually seeks to rely on unspecified sections of CANRA to establish liability, such attempt would likewise fail. The law is clear that, to prove a violation under section 815.6, a plaintiff must plead the existence of a specific statutory duty. " ' "Unless the applicable enactment is alleged in specific terms, a court cannot determine whether the enactment relied upon was intended to impose an obligatory duty to take official action to prevent foreseeable injuries or whether it was merely advisory in character." ' [Citation.]" (*Terrell R., supra,* 102 Cal.App.4th at p. 638.)

(2) *Penal Code section 11166, subdivisions (a), (f), and (i). (Stats. 1996, ch. 1081, § 3.5, pp. 7410–7412.)*

Jacqueline T. contends Penal Code section 11166, subdivisions (a), (f) and (i) imposed mandatory duties on County and Employees to accept reports of abuse from mandated, voluntary and anonymous reporters; to make internal reports; and to timely cross-report to other agencies regarding suspected child abuse.[8] She further contends County and Employees breached these manda-

---

[8] Jacqueline T. acknowledges the language in Penal Code section 11166, subdivision (j) and subdivision (g), upon which she relies on appeal, is part of the current version of the statute rather than the version in effect when the alleged breach occurred. Jacqueline T. explains, however, that the language in subdivision (j) is nearly identical to that found in subdivision (i) of the prior version of the statute, and that the language in subdivision (g) is nearly identical to that found in subdivision (f) of the prior version of the statute, both of which were in effect at the relevant time and were relied upon below. We find Jacqueline T.'s reliance at various times on different versions of the same statute both confusing and frustrating. Nonetheless, rather than find waiver, which we are no doubt entitled to do, we give Jacqueline T. the benefit of the doubt and address the merits of her argument based on the version of section 11166 in effect during the relevant time period—from 1998 to 2000—which provided in relevant part:

"(a) Except as provided in subdivision (b), any child care custodian, health practitioner, employee of a child protective agency, child visitation monitor, firefighter, animal control officer, or humane society officer who has knowledge of or observes a child, in his or her professional capacity or within the scope of his or her employment, whom he or she knows or reasonably suspects has been the victim of child abuse, shall report the known or suspected instance of child abuse to a child protective agency immediately or as soon as practically possible by telephone and shall prepare and send a written report thereof within 36 hours of receiving the information concerning the incident. A child protective agency shall be notified and a report shall be prepared and sent even if the child has expired, regardless of whether or not the possible abuse was a factor contributing to the death, and even if suspected child abuse was discovered during an autopsy. For the purposes of this article, 'reasonable suspicion' means that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on his or

tory duties when Yee allegedly failed to timely cross-report to law enforcement after receiving a report of suspected abuse from Minors' therapist, and when Richards allegedly failed to timely prepare an internal report or to timely cross-report to law enforcement after receiving reports of suspected abuse from Minors' great-grandmother.

The relevant version of Penal Code former section 11166, subdivision (a) required, with some exceptions, a child care custodian who "has knowledge of or observes a child, . . . whom he or she knows or reasonably suspects has been the victim of child abuse" to report such abuse to a child protective agency immediately or as soon as practically possible. The relevant version of former section 11166, subdivision (f) permitted, but did not require, "[a]ny other person who has knowledge of or observes a child whom he or she knows or reasonably suspects has been a victim of child abuse may report the known or suspected instance of child abuse to a child protective agency." And the relevant version of former section 11166, subdivision (i) required, with some exceptions, a county welfare department to "immediately, or as soon as practically possible" cross-report to law enforcement and certain other agencies by telephone "every known or suspected instance of child abuse," and to submit a written report of the known or suspected abuse to such agencies "within 36 hours" of receiving the relevant information.

We conclude Jacqueline T.'s reliance on these three provisions to prove violations of section 815.6 is misplaced. With respect to Penal Code former section 11166, subdivision (a), a mandatory duty was imposed on certain

---

her training and experience, to suspect child abuse. For the purpose of this article, the pregnancy of a minor does not, in and of itself, constitute a basis of reasonable suspicion of sexual abuse. [¶] . . . [¶]

"(f) Any other person who has knowledge of or observes a child whom he or she knows or reasonably suspects has been a victim of child abuse may report the known or suspected instance of child abuse to a child protective agency. [¶] . . . [¶]

"(i) A county probation or welfare department shall immediately, or as soon as practically possible, report by telephone to the law enforcement agency having jurisdiction over the case, to the agency given the responsibility for investigation of cases under Section 300 of the Welfare and Institutions Code, and to the district attorney's office every known or suspected instance of child abuse, as defined in Section 11165.6, except acts or omissions coming within subdivision (b) of Section 11165.2, or reports made pursuant to Section 11165.13 based on risk to a child which relates solely to the inability of the parent to provide the child with regular care due to the parent's substance abuse, which shall be reported only to the county welfare department. A county probation or welfare department also shall send a written report thereof within 36 hours of receiving the information concerning the incident to any agency to which it is required to make a telephone report under this subdivision." (See Stats. 1996, ch. 1081, § 3.5, pp. 7410–7412.)

mandated reporters, including child care custodians, of child abuse. Here, County and Employees were the alleged *receivers* of three reports of alleged child abuse from third parties rather than the reporters themselves. As such, they could not, as a matter of law, have breached a mandatory duty to report pursuant to this provision.

With respect to Penal Code former section 11166, subdivision (f), it simply imposed no mandatory duty. Rather, it permitted, but did not require, certain voluntary reporters to submit reports of child abuse. As such, neither County nor Employees could, as a matter of law, have violated a mandatory duty pursuant to this provision. (*Terrell R., supra*, 102 Cal.App.4th at p. 639 [" 'application of [Government Code] section 815.6 requires that the enactment at issue be *obligatory*' "].)

Finally, as set forth above, the relevant version of Penal Code former section 11166, subdivision (i) required a county welfare department to "immediately, or as soon as practically possible" cross-report by telephone to certain public agencies "every known or suspected instance of child abuse," and to then submit certain written reports within 36 hours. Here, it is undisputed that Employees cross-reported to the Newark Police Department each of the three reports of alleged abuse it received. It is further undisputed that, following receipt of each of those cross-reports, the Newark Police Department determined based on the evidence that the abuse allegations were unsubstantiated. As such, even assuming County or Employees breached a mandatory duty to *timely* cross-report under former subdivision (i), Jacqueline T. could not, as a matter of law, establish that such breach was a proximate cause of Minors' alleged injuries, which section 815.6 requires.[9] (*Wilson v. County of San Diego* (2001) 91 Cal.App.4th 974, 980 [111 Cal.Rptr.2d 173] [to establish liability under § 815.6, a plaintiff "must demonstrate . . . breach of the statute's mandatory duty was a proximate cause of the injury suffered"]; see also *Thai v. Stang* (1989) 214 Cal.App.3d 1264, 1274 [263 Cal.Rptr. 202] ["[i]f the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible factor in bringing it about and cannot [as a matter of law] be a substantial factor in producing it"].)

---

[9] The first report of abuse, received August 27, 1998, was cross-reported by Yee on September 26, 1998. It is unclear when the second report, received October 29, 1999, was cross-reported by Richards. The third report, received June 29, 2000, was cross-reported by Richards on July 7, 2000.

(3) *Penal Code section 11166.3. (Stats. 1988, ch. 898, § 1, pp. 2862–2863.)*

Jacqueline T. also claims breach of a mandatory duty to cross-report instances of known or suspected child abuse pursuant to Penal Code section 11166.3.[10]

The only language in the relevant version of this statute that purported to govern County's conduct provided: "The county welfare department or social services department shall, *in cases where a minor is a victim of actions specified in Section 288 of this code and a petition has been filed pursuant to Section 300 of the Welfare and Institutions Code with regard to the minor, . . .* evaluate what action or actions would be in the best interest of the child victim" and then "submit in writing its findings and the reasons therefor to the district attorney on or before the completion of the investigation." (Pen. Code, former § 11166.3, subd. (a), italics added.) Here, undisputedly, no petition to initiate dependency proceedings had been filed pursuant to Welfare and Institutions Code section 300 when County's alleged breach of this duty occurred. As such, Penal Code section 11166.3 provided no basis for liability under section 815.6.

---

[10] The version of Penal Code former section 11166.3 in effect during the relevant dates provided in full:

"(a) The Legislature intends that in each county the law enforcement agencies and the county welfare or social services department shall develop and implement cooperative arrangements in order to coordinate existing duties in connection with the investigation of suspected child abuse cases. The local law enforcement agency having jurisdiction over a case reported under Section 11166 shall report to the county welfare department that it is investigating the case within 36 hours after starting its investigation. The county welfare department or social services department shall, in cases where a minor is a victim of actions specified in Section 288 of this code and a petition has been filed pursuant to Section 300 of the Welfare and Institutions Code with regard to the minor, in accordance with the requirements of subdivision (c) of Section 288, evaluate what action or actions would be in the best interest of the child victim. Notwithstanding any other provision of law, the county welfare department or social services department shall submit in writing its findings and the reasons therefor to the district attorney on or before the completion of the investigation. The written findings and the reasons therefor shall be delivered or made accessible to the defendant or his or her counsel in the manner specified in Sections 859 and 1430. The child protective agency shall send a copy of its investigative report and any other pertinent materials to the licensing agency upon the request of the licensing agency.

"(b) The local law enforcement agency having jurisdiction over a case reported under Section 11166 shall report to the district office of the State Department of Social Services any case reported under this section if the case involves a facility specified in paragraph (5) or (6) of Section 1502 or in Section 1596.750 or 1596.76 of the Health and Safety Code and the licensing of the facility has not been delegated to a county agency. The law enforcement agency shall send a copy of its investigation report and any other pertinent materials to the licensing agency upon the request of the licensing agency." (See Stats. 1988, ch. 898, § 1, pp. 2862–2863.)

(4) *Penal Code section 11165.7. (Stats. 1992, ch. 459, § 1, pp. 1824–1825.)*

Jacqueline T. contends Penal Code section 11165.7, like section 11166, subdivision (a), imposes a mandatory duty on County and Employees to report suspected child abuse, which they also breached in this case.[11]

This provision sets forth the statutory definition of the term "mandated reporter"; it does not purport to impose any duty. As such, Jacqueline T.'s reliance on Penal Code section 11165.7 to establish liability under section 815.6 fails.

(5) *Penal Code section 11165.9. (Stats. 1987, ch. 1459, § 16, p. 5521.)*

Jacqueline T. contends County and Employees breached a mandatory duty under Penal Code section 11165.9 to accept reports of suspected child abuse from mandated, voluntary and anonymous reporters. As Jacqueline T. concedes, however, a different version of this statute—one that merely set forth

---

[11] Penal Code section 11165.7 (Stats. 1992, ch. 459, § 1, pp. 1824–1825) provides in relevant part:

"(a) As used in this article, 'child care custodian' means a teacher; an instructional aide, a teacher's aide, or a teacher's assistant employed by any public or private school, who has been trained in the duties imposed by this article, if the school district has so warranted to the State Department of Education; a classified employee of any public school who has been trained in the duties imposed by this article, if the school has so warranted to the State Department of Education; an administrative officer, supervisor of child welfare and attendance, or certificated pupil personnel employee of any public or private school; an administrator of a public or private day camp; an administrator or employee of a public or private youth center, youth recreation program, or youth organization; an administrator or employee of a public or private organization whose duties require direct contact and supervision of children; a licensee, an administrator, or an employee of a licensed community care or child day care facility; a headstart teacher; a licensing worker or licensing evaluator; a public assistance worker; an employee of a child care institution including, but not limited to, foster parents, group home personnel, and personnel of residential care facilities; a social worker, probation officer, or parole officer; an employee of a school district police or security department; any person who is an administrator or presenter of, or a counselor in, a child abuse prevention program in any public or private school; a district attorney investigator, inspector, or family support officer unless the investigator, inspector, or officer is working with an attorney appointed pursuant to Section 317 of the Welfare and Institutions Code to represent a minor; or a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of this code, who is not otherwise described in this section.

"(b) Training in the duties imposed by this article shall include training in child abuse identification and training in child abuse reporting. As part of that training, school districts shall provide to all employees being trained a written copy of the reporting requirements and a written disclosure of the employees' confidentiality rights.

"(c) School districts which do not train the employees specified in subdivision (a) in the duties of child care custodians under the child abuse reporting laws shall report to the State Department of Education the reasons why this training is not provided.

"(d) Volunteers of public or private organizations whose duties require direct contact and supervision of children are encouraged to obtain training in the identification and reporting of child abuse."

the statutory definition of "child protective agency" and did not purport to impose any duty—was in effect when the alleged child abuse was occurring between 1998 and 2000.[12] Moreover, even assuming County or Employees were subject at the relevant time to a mandatory statutory duty to accept reports of abuse, Jacqueline T. neglects to inform us how or when they breached such duty. The undisputed evidence proved County received three reports of possible child abuse of Roes 1 and 2—Yee received one report from Minors' therapist, and Richards received two reports from Minors' great-grandmother. While Jacqueline T. complains County and Employees failed to adequately respond to these reports, she does not contend County or Employees refused to accept them. Given this, we conclude Jacqueline T. cannot as a matter of law prove any breach of a mandatory duty to accept reports of abuse.

(6) *Welfare and Institutions Code section 16501, subdivision (f).*
 *(Stats. 1996, ch. 1083, § 9, pp. 7593–7595.)*

Jacqueline T. contends County and Employees breached a mandatory duty under Welfare and Institutions Code section 16501, subdivision (f) to "respond to any report of imminent danger to a child immediately and all other reports within 10 calendar days."[13]

---

[12] The statute in effect during the relevant time provided: "As used in this article, 'child protective agency' means a police or sheriff's department, a county probation department, or a county welfare department. It does not include a school district police or security department." (Stats. 1987, ch. 1459, § 16, p. 5521, repealed by Stats. 2000, ch. 916, § 8.)

The current version of Penal Code section 11165.9, which did not become effective until January 1, 2001, provides: "Reports of suspected child abuse or neglect shall be made by mandated reporters to any police department, sheriff's department, county probation department if designated by the county to receive mandated reports, or the county welfare department. It does not include a school district police or security department. Any of those agencies shall accept a report of suspected child abuse or neglect whether offered by a mandated reporter or another person, or referral by another agency, even if the agency to whom the report is being made lacks subject matter or geographical jurisdiction to investigate the reported case, unless the agency can immediately electronically transfer the call to an agency with proper jurisdiction. When an agency takes a report about a case of suspected child abuse or neglect in which that agency lacks jurisdiction, the agency shall immediately refer the case by telephone, fax, or electronic transmission to an agency with proper jurisdiction." (See Stats. 2000, ch. 916, § 8.)

[13] Welfare and Institutions Code section 16501, subdivision (f) provides: "(f) As used in this chapter, emergency response services consist of a response system providing in-person response, 24 hours a day, seven days a week, to reports of abuse, neglect, or exploitation, as required by Article 2.5 (commencing with Section 11164) of Chapter 2 of Title 1 of Part 4 of the Penal Code for the purpose of investigation pursuant to Section 11166 of the Penal Code and to determine the necessity for providing initial intake services and crisis intervention to maintain the child safely in his or her own home or to protect the safety of the child. *County welfare departments shall respond to any report of imminent danger to a child immediately and all other reports within 10 calendar days.* An in-person response is not required when the

■ With respect to the duty under this section to respond immediately to reports of imminent danger to a child, it is clear such duty arises only if a prior determination has been made that imminent danger exists—a discretionary determination expressly entrusted to County and Employees. (*Newton, supra,* 217 Cal.App.3d at p. 1560.) As such, County's or Employees' determination that no imminent danger existed is protected by the broad grant of immunity sections 820.2 and 821.6 afford county welfare departments and their officials in investigating alleged acts of child abuse and thereafter deciding whether to instigate dependency proceedings. (*Newton, supra,* at p. 1560 [concluding that county welfare department officials were immune from liability for their determination regarding whether an "emergency situation[]" existed that would trigger a mandatory duty to conduct an immediate in-person response pursuant to Welf. & Inst. Code, § 16504]; see also *Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498, 507 [93 Cal.Rptr.2d 327, 993 P.2d 983] [where a statute calls for the exercise of judgment, expertise, and discretion, it does not create a mandatory duty within the meaning of § 815.6].)

With respect to the duty under Welfare and Institutions Code section 16501, subdivision (f) to "respond" within 10 days to "all other reports" of abuse, we conclude the undisputed evidence reveals no breach. Nowhere does the statute define "respond" or mandate a particular response. And here, County officials undisputedly responded to each report of alleged abuse of Roes 1 and 2 by promptly generating screener narratives and then referring the matters to social workers for investigation, well within 10 days of receiving the reports. To the extent Jacqueline T. contends these responses were inadequate, County's and Employees' decisions in this regard were again discretionary, and thus immunized under sections 820.2 and 821.6 for the reasons discussed. (*Haggis v. City of Los Angeles, supra,* 22 Cal.4th at p. 507.)

(7) *DSS Manual regulation 31-101.2.*

Finally, Jacqueline T. contends County breached a mandatory duty under DSS Manual regulation 31-101.2 to utilize social workers "skilled in emergency response" when responding to referrals of reports of alleged child abuse.[14]

We agree this regulatory language amounts to an order leaving County no choice but to utilize social workers skilled in emergency response when

---

county welfare department, based upon an evaluation of risk, determines that an in-person response is not appropriate. This evaluation includes collateral, contacts, a review of previous referrals, and other relevant information, as indicated." (Italics added.) (See Stats. 1996, ch. 1083, § 9, pp. 7593, 7595.)

[14] DSS Manual regulation 31-101.2 provides: "The social worker responding to a referral shall be skilled in emergency response."

responding to a child abuse referral. (See *Scott, supra,* 27 Cal.App.4th at p. 141.) However, even if County could be held liable for failing to obey this order, the record reveals no facts, disputed or otherwise, tending to prove a failure occurred in this case.

In particular, Jacqueline T. has failed to set forth any evidence that identifies what it means to be "skilled in emergency response." Further, the evidence Jacqueline T. has identified does not tend to prove that County utilized social workers *unskilled* in emergency response when responding to referrals with respect to the alleged abuse of Roes 1 and 2.

Jacqueline T. points us to nothing in the record tending to reveal a failure of skills or training with respect to Yee, and the undisputed evidence suggests otherwise. At the time of his investigation into the alleged abuse, Yee had been a social worker for 21 years, and had received extensive ongoing training in child abuse investigation.

With respect to Richards, Jacqueline T. points only to select portions of her deposition testimony where she admits to not being "aware of all the details of what [the DSS] manual says," to not knowing what the "[DSS] manual states" with respect to the significance to be given during an investigation (rather than during a referral) to a parent's history of substance abuse or criminal behavior, to receiving "more extensive training in Division 31 regulations . . . after [her] investigation" in this case, and to not "hav[ing] [the department's protocols] memorized." Such evidence, however, without more, would not permit a reasonable person to conclude she was unskilled in emergency response. Rather, suggesting the contrary, undisputed evidence shows Richards held a degree in psychology and an advanced degree in social work, was assigned to County's emergency response unit in 1998, over a year before she began investigating the alleged abuse of Roes 1 and 2, and began receiving ongoing professional training in child abuse investigation at the time of her hiring in 1998.

Based on this record, we conclude that, even viewing the evidence in a light favorable to Jacqueline T., as the law requires, no reasonable person could here find a breach of this duty. As such, Jacqueline T.'s argument based on DSS Manual regulation 31-101.2 provides no basis for holding County liable for negligence or negligence per se.

Accordingly, for the reasons set forth above, we conclude the grant of summary judgment to respondents was proper and, thus, affirm the judgment.

## DISPOSITION

The judgment is affirmed.

Pollak, Acting P. J., and Siggins, J., concurred.

On October 4, 2007, the opinion was modified to read as printed above.