Filed 10/1/13; pub. and mod. order 10/29/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHRISTINA C. et al., | |
| Plaintiffs and Appellants, | G047805 |
| v. | (Super. Ct. No. 30-2011-00437624) |
| COUNTY OF ORANGE et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, John C. Gastelum, Judge. Affirmed.

Gary Paul Levinson for Plaintiffs and Appellants.

Koeller, Nebeker, Carlson & Haluck, William L. Haluck, Matthew B. Golper and Zachary M. Schwartz, for Defendants and Respondents.

\*                    \*                    \*

C.C. and his mother, Christina C. (mother), appeal from the trial court's summary judgment in favor of the County of Orange, its Social Services Agency (SSA), and several of SSA's social workers.[1]  Plaintiffs complain the trial court erred in concluding public employee immunity (Gov. Code, § 820.2) barred their claims arising from SSA's decision to remove 10-year-old C.C. from mother's care and place him with father, only to return C.C. to his mother when he fared poorly in father's care.  As we explain, plaintiffs' claims for reversal have no merit, and we therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Mother and father married in 1998, the year C.C. was born, but rarely resided together and divorced in 2000 when C.C. was almost two years old.  According to mother, she received primary physical custody of C.C.  After a four-year period of contentious battles with father, marked by multiple interventions by SSA social workers amidst mother's declining mental health, the family court ordered an Evidence Code section 730 study in which the evaluator concluded mother suffered from cognitive impairments and poor boundaries that affected her ability to safely parent C.C.  The family court agreed and vested father with exclusive legal and physical custody in June 2004.

Four years later in October 2008, when C.C. was almost 10 years old, father was arrested on charges of attempted rape by furnishing his live-in maid with ice

---

**1**　　**We refer to C.C. by his initials, and his mother and father only by those designations, to preserve C.C.'s confidentiality (Cal. Rules of Court, rule 8.401(a)(1) & (3)) in this suit initiated by his mother as his guardian.**

cream containing benzodiazepine, a powerful sleeping medication. The charges included illegal firearm possession by a felon. According to mother, she and C.C. had both tested positive for benzodiazepine at the time of his birth though she was not taking any sleeping medication. She also pegged her mental and emotional decline to one or more encounters with father in 2001 and earlier in which she now believed he had drugged and raped her. She had unsuccessfully sought a restraining order against him in 2001. The prosecutor in the current criminal action involving the maid added charges against father for rape using drugs and rape of an unconscious person based on mother's allegations dating to a March 2001 incident.

Meanwhile, SSA had detained C.C. at Orangewood Children's Home when father was arrested. The police interviewed mother at or near the time of father's arrest, but did not release C.C. to her care because she was not entitled to custody under the family court's order and, moreover, the officer and a police-affiliated victim advocate observed "current indicators that the mother might not be considered fit to parent at this time." For example, mother "appeared delusional, with delusions of persecution and religious affiliation," she "reported to have seen ghosts," and the officer "also questioned the mother's ability to make appropriate choices" given she stayed with father more than three years despite claiming she was "repeatedly raped."

SSA also interviewed mother. She explained to a social worker she was conscious during and tolerated father's sex acts against her because "'no one believed me,'" "'he convinced me,'" and because she previously had been abused and neglected, including by her father. Mother diagnosed herself "as suffering from PTSD [posttraumatic stress disorder], with an 'ongoing affect' . . . ." The ghosts she had seen on her property had "been recorded and verified as authentic." She now supported

3

herself "through playing cards," stated she kept a "very stable and clean home," and according to the social worker's report, "mother repeatedly argue[d] these points over and over again, insisting she is a capable parent and that her son should immediately be placed with her." When the worker "suggested that a more recent psychological evaluation might be necessary to assess this very issue, the mother appeared very resistant to the process." SSA did not immediately place C.C. with mother.

Instead, the dependency court at C.C.'s detention hearing in October 2008 ordered monitored visitation for mother and father at SSA's offices. The court vested SSA with discretion to "lift/reinstate monitor . . . for mother and father" and to liberalize parental visitation. Mother subsequently provided SSA with a mental health evaluation prepared by a nurse practitioner associated with a psychiatrist. The nurse practitioner disagreed with a previous bipolar disorder diagnosis for mother, explaining she "did not note any delusional thinking, paranoia, psychotic processes, tangential thinking, or memory impairment," nor any need for medication. The nurse concluded mother "does not appear to have any symptomology that would interfere with her role as a mother or for the care of her son." Mother's court-appointed therapist and her personal counselor similarly agreed the court should return C.C. to her care on grounds that mother had never abused him.

Visits SSA arranged for C.C. with his maternal grandfather in Laguna Beach had gone well, but the grandfather could not care for C.C. alone because of his age and ill health. Mother, however, agreed to move in with her father, and SSA concluded that a "combined household like this," which included the grandfather's live-in housekeeper, would "be safe[] for the child and would provide more supervision in the home." SSA recommended the home placement under a Conditional Release to Intensive

4

Services Program (CRISP) agreement that mother signed, which included 15 specific conditions mother assented to in the release. The conditions included the following: "I will continue to attend therapy twice a week," "I will facilitate visits between the child and his father and will not speak negatively of the father in the child's presence," "I understand [the] frequency of visits will be determined by the CRISP worker," and "I shall obey any reasonable directions of my CRISP [w]orker regarding the care of the child in my custody."

The dependency court endorsed the CRISP agreement at a January 2009 hearing, and further ordered the "child may be redetained if it *appears* [the] terms and conditions of the CRISP release agreement are violated or [the] child is at risk" (italics added) and that "[a]ll prior orders . . . remain[ed] in full force and effect." SSA placed C.C. with mother in grandfather's home on January 8, 2009. According to SSA, mother had difficulty from the outset abiding by the terms of the agreement, including the requirement to attend counseling therapy twice a week and to refrain from speaking negatively of father in front of the child, who complained to his therapist that mother pressured him to join in her criticism.

Meanwhile, according to SSA, father's visits were so positive that the agency considered dispensing with a monitor. The court at a hearing on February 10, 2009, considered the matter and confirmed SSA retained authority to lift the monitor. Mother opposed allowing father unmonitored visitation, but had not attended the hearing. According to SSA social worker Jennifer Marks, when she telephoned mother to advise her what occurred and that SSA planned to allow unmonitored visitation with father, mother refused to cooperate. Marks explained her refusal put her in violation of the CRISP agreement and C.C. would be redetained, but mother remained steadfast.

According to mother, she did not expressly refuse to transport C.C. to any future visits with father, and instead simply voiced her concern about unmonitored visitation and asked Marks to contact mother's lawyer.

C.C. happened to be on a monitored visit with father and, after hanging up with mother, Marks arranged for C.C. to be redetained and placed in father's care without a monitor. She then telephoned mother to notify her she need not pick up C.C. from the monitored visit at father's home that day. After several continuances into May 2009, the dependency court ratified SSA's decision to redetain C.C. and place him with father.

C.C. remained in father's care for approximately 13 months until, in March 2010, SSA redetained him and filed a supplemental dependency petition on grounds of general neglect, educational neglect, and concerns father exposed C.C. to pornographic magazines, videos, and violent computer games. Father had not complied with his case plan requirement to ensure C.C.'s attendance at school; C.C. also often fell asleep in class, did not turn in his homework, and mother and C.C.'s previous therapist reported he appeared preoccupied with sexual and violent themes that manifested itself in verbal abuse against mother and play therapy that included making dolls attack and rape each other. SSA immediately placed C.C. in mother's care.

Father pleaded guilty in November 2010 to one count of poisoning his maid with benzodiazepine and a felon-in-possession firearm charge, and the juvenile court closed the dependency proceedings with exit orders awarding mother sole physical and legal custody of C.C., with monitored visitation for father.

Mother filed this civil action in January 2011 on her behalf and on behalf of C.C. as her minor child, alleging SSA and its social workers violated their civil rights. Specifically, the complaint alleged three "Counts" against the defendants: (1) "*Monell*

Related Claims"; (2) "Violation of State Civil Rights" under Civil Code sections 43, 49 51, and 52.1; and (3) intentional infliction of emotional distress.[2]

Defendants moved in June 2012 for summary judgment or, in the alternative, summary adjudication. The trial court granted summary judgment. The court explained that, based on the dependency court's orders vesting discretion with SSA over C.C.'s placement and visitation, with express authorization to redetain him under the CRISP release, "[t]he acts or omissions complained of appear to be within defendants' granted authority." The court held that under the immunity afforded social workers per Government Code section 820.2, "it is irrelevant whether defendants were correct in their decisions or even whether they abused their discretion."

The court observed, "The [summary judgment] opposition essentially summarizes father's shortcomings and explains why the government was wrong to take custody from [mother]," but "[i]t does not even address the issue of immunity — the heart of defendants' motion — until page 24, wherein plaintiffs briefly argue immunities do not apply here because defendants acted with malice." The court noted, however, that "plaintiffs fail to cite, in their papers, any evidence supporting a possible finding of malice on the part of any of the defendants." The court acknowledged that at the hearing on defendants' motion, plaintiffs' counsel "advanced the theory that social worker Marks maliciously terminated the CRISP release to [m]other and changed custody to [f]ather to 'punish' [m]other because she had the temerity to challenge the social worker's decision

---

**2** **Plaintiffs never explain what they meant by *"Monell* Related Causes of Action," but in *Monell v. Department of Social Services of City of New York* (1978) 436 U.S. 658, the high court held an action under 42 U.S.C. section 1983 against a governmental entity must fail unless the entity engaged in a "custom, practice, or policy" of violating individual civil rights, rather than isolated instances invading constitutional rights. Civil Code section 43 provides that every person has a right to be free from "injury to his personal relations"; Civil Code section 49 forbids "the abduction . . . of a child from a parent"; Civil Code section 51, known as the Unruh Civil Rights Act, prohibits discrimination in all business establishments; and Civil Code section 52.1 provides a civil remedy against hate crimes causing or threatening violent interference with an individual's civil rights.**

7

to grant unmonitored visits." But the court observed that the arguments of counsel are not evidence.

The court found no merit in plaintiffs' invocation of seminal dependency civil rights cases like *Santosky v. Kramer* (1982) 455 U.S. 745. The court explained: "Although not clear, in citing these cases[] plaintiffs appear to argue defendants lacked authority to take custody away from [mother]. But none of the cases cited support this contention here and plaintiffs ignore that the Juvenile Court expressly granted such authority to the defendants. And to the extent plaintiffs argue the court had no authority to do so, such was not a theory pled in the [c]omplaint, which frames a summary judgment motion." The trial court granted summary judgment in favor of defendants, and plaintiffs now appeal.

## II

## DISCUSSION

### A. *General Summary Judgment Principles*

Facts are the lifeblood of summary judgment proceedings because absent a factual dispute, trial is unnecessary. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*) ["The purpose of the law of summary judgment is to . . . cut through the parties' pleadings . . . to determine whether . . . trial is in fact necessary"].) We review a grant of summary judgment de novo. "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925.)

A motion for summary judgment should be granted if the submitted papers show that "there is no triable issue as to any material fact," and that the moving party is

entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant meets her burden of showing a cause of action has no merit if she shows that one or more elements of the cause of action cannot be established, "or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).)

If the moving party carries that burden, she "causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) A triable issue of material fact exists "'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.] Thus, a party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145 (*Dollinger*).)

B.      *Plaintiffs Forfeit Their Appellate Challenge to the Summary Judgment Ruling*

Plaintiffs complicate our review of their claims by failing to provide any record citations in the argument portion of their brief. Absent the requisite cites, it is not clear their appellate claims are founded in the evidence before the trial court. (*Dollinger*, *supra*, 199 Cal.App.4th at pp. 1144-1145 [party opposing summary judgment "must produce admissible evidence"]; see also *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 29 ["an appellant must support all statements of fact in his briefs with citations to the record"]; Cal. Rules of Court, rule 8.204(a)(1)(C).) Plaintiffs' general citation in the "Facts" section of their brief to portions of the record spanning almost 50 pages is inadequate. "Counsel is admonished that . . . citations are to include the internal page

**9**

reference where the applicable point is found. [Citation.]" (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 (*Del Real*).)

Plaintiffs also fail to support their central claim with *any* record citations. The section of their brief purportedly identifying "Triable Issues of Fact" as the basis for their summary judgment appeal does not include a single record citation. "The appellate court is not required to search the record on its own seeking error." (*Del Real*, *supra*, 95 Cal.App.4th at p. 768.) To the contrary, we must presume the judgment is correct absent an affirmative showing by the appellant. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).)

Points "made without citation to the record . . . [are] deemed waived" in the reviewing court's discretion. (*Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1301; *Del Real*, *supra*, 95 Cal.App.4th at p. 768.) We note the presumption in favor of judgments rendered below is "'not only a general principle of appellate practice but [also] an ingredient of the constitutional doctrine of reversible error.'" (*Denham*, *supra*, 2 Cal.3d at p. 564.) Consequently, we conclude plaintiffs forfeit their appellate claims. Put another way, plaintiffs have failed their burden to demonstrate error, and we therefore affirm the judgment.

C.     *Plaintiffs' Claims Also Fail on the Merits*

Even overlooking plaintiffs' forfeiture, their appellate challenge fails. The trial court did not err in granting summary judgment. Plaintiffs claim their "civil case boils down, in large part, to the reason(s) for **why** the Department of Social Services removed C.C. from his mother's care on February 10, 2009." (Original emphasis.) They dispute Marks' explanation the placement failed because mother violated the CRISP agreement's express terms, including CRISP Condition 9(b): "I will continue to attend

**10**

therapy twice a week" and CRISP Condition 9(d): "I will facilitate visits between the child and his father." Plaintiffs claim instead that SSA removed C.C. simply "out of arrogance, and to punish [mother] when [she] asserted a contrary position [regarding paternal visits]" and "for financial reasons, due to department cutbacks" precluding a monitor for father's visits. Plaintiffs assert: "The reasons for the removal of C.C. from [mother]'s legitimate custody is at issue and needs to be decided by the trier of fact in the civil case."

Plaintiffs' argument for reversal fails for at least four reasons. First, they provided no evidence the true reasons SSA removed C.C. stemmed from arrogance, to punish mother, or due to budgetary constraints, as plaintiffs claim. Plaintiffs do not indicate where in their separate statement they specified any facts supporting these contentions. As the trial court observed, plaintiffs "did not submit a Separate Statement of their own proffered facts; they only provide a response to defendants' 81 proffered facts." It appears plaintiffs simply concluded SSA acted with arrogance, a punitive intent, or for misplaced financial reasons. But it is not enough in opposing summary judgment to surmise reasons or make unfounded allegations: "a party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger*, *supra*, 199 Cal.App.4th at pp. 1144-1145.)

Second, only material factual disputes bear any relevance: "no amount of factual conflict upon other aspects of the case will preclude summary judgment." (*Shively v. Dye Creek Cattle Co.* (1994) 29 Cal.App.4th 1620, 1627.) Plaintiffs do not explain how SSA's asserted arrogance, punitive intent, or minimal access to county coffers have anything to do with their causes of action.

**11**

Specifically, plaintiffs filed suit for alleged hate crimes (Civ. Code, § 52.1), violations of the Unruh Civil Rights Act (Civ. Code, § 51), child abduction (Civ. Code, § 49), "injury to personal relations" (Civ. Code, § 43), unexplained "Monell-related causes of action," and intentional infliction of emotional distress. But they cite no authority and make no attempt to explain how SSA's actions in the dependency context provide a basis for any of their wide-ranging causes of action. (See *In re La Shonda B.* (1979) 95 Cal.App.3d 593, 599 [dependency proceeding by nature "is brought on behalf of the child, not to punish the parents"]; see also Cal. Rules of Court, rule 8.204(a)(1)(B) [appellant must support each point by reasoned argument "and, if possible, by citation to authority"].)

Third, mother overlooks that her core complaint about C.C.'s removal from her care rests with the dependency court, not SSA. The court, in the final analysis, makes the decision at the detention hearing (Welf. & Inst. Code, §§ 315, 319) whether a child will remain out of parental custody and again at the disposition hearing whether the detention will continue, where the child will be placed, and on what conditions (Welf. & Inst. Code, §§ 358, 361). Here, the court at the detention hearing in the dependency proceedings placed C.C. with SSA, authorized SSA to release C.C. to his parents or other "suitable adult as deemed appropriate," and vested SSA with discretion to "lift/reinstate monitor . . . for mother *and father once released*" and to liberalize parental visitation. (Italics added.) Then, at the dispositional hearing, the dependency court ratified C.C.'s temporary placement with mother under the terms she agreed to in the CRISP release, and authorized SSA to redetain him "if it *appears* the terms and conditions . . . are violated or [the] child is at risk." (Italics added.) The court at the disposition hearing also expressly noted "[a]ll prior orders to remain in full force and effect," thereby

continuing SSA's authority to modify C.C.'s placement and determine whether visitation required a monitor.

Mother suggests on appeal that the trial court improperly delegated its authority in these important matters to SSA, including the authority to end the CRISP placement and place C.C. with father. But mother offered no challenge in the dependency proceedings to the trial court's delegation, and doing so now does not aid her in this civil lawsuit *against SSA*. In particular, mother does not argue and provided no evidence below that SSA did anything to wrongfully obtain or coax from the court authority over the CRISP placement. It would be difficult to conceive such evidence, since as a practical matter someone besides the court must have the ability to quickly redetain a child from a placement if necessary, particularly an intensive CRISP placement. In any event, the key consideration pertinent to this appeal is that nothing implicates SSA and its social workers in plaintiffs' belated complaint about the court's allegedly improper delegation of placement authority. Presumably plaintiffs did not sue the dependency court because of judicial immunity. (See, e.g., *Howard v. Drapkin* (1990) 222 Cal.App.3d 843, 851The concept of judicial immunity is long-standing and absolute"].) But that does not furnish a basis to sue SSA or its social workers acting under delegated judicial authority.

Fourth and related, although social workers are not judicial officers entitled to judicial immunity, the trial court properly determined defendants were entitled to judgment as a matter of law based on the immunity that shields discretionary decisions by public employees. (Gov. Code, § 820.2.) Government Code section 820.2 provides that, "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission that was the result of the exercise of the discretion

vested in him, whether or not such discretion is abused." (*Ibid.*) Under this provision, social workers are entitled to immunity for their child removal and placement decisions in dependency proceedings. (*Jacqueline T. v. Alameda County Child Protective Services* (2007) 155 Cal.App.4th 456, 466 (*Jacqueline T.*).)

The immunity applies even to "lousy" decisions in which the worker abuses his or her discretion, including decisions based on "woefully inadequate information." (*Ortega v. Sacramento County Dept. of Health & Human Services* (2008) 161 Cal.App.4th 713, 725, 728, 733 [social worker returned child to father, who promptly stabbed the child in the heart and lungs].) Consequently, the factual questions plaintiffs raise regarding *why* SSA removed C.C. from mother's care do not preclude summary judgment because they are irrelevant. Simply put, even assuming arguendo SSA abused its discretion by acting in an arrogant or punitive manner or with undue consideration for monitoring costs, the immunity provided in Government Code section 820.2 expressly applies "whether or not such discretion is abused." Section 820.2 specifies no exception for malice. The same wide discretion applies even if Marks or other SSA social workers were grossly incorrect in concluding mother violated the CRISP agreement. As the *Ortega* court explained, "'[C]laims of *improper* evaluation cannot divest a discretionary policy decision of its immunity."[3] (*Ortega*, *supra*, 161 Cal.App.4th at p. 733; accord, *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 984-985.)

---

**3** The trial court also noted, as defendants had argued, that defendants appeared to be entitled to immunity under Government Code section 821.6, which provides: "'A public employee is not liable for injury caused by his . . . instituting or prosecuting any judicial or administrative proceeding, . . . even if he . . . acts maliciously and without probable cause." (See, e.g., *Jacqueline T.*, *supra*, 155 Cal.App.4th at pp. 465, 468 [finding social workers "immune from liability for their alleged acts and omissions under [Gov. Code] sections 820.2 *and 821.6*," italics added].) Like the trial court, however, we conclude that "[b]ecause defendants [are] immune under section 820.2, the [c]ourt need not address the parties' argument about prosecutorial immunity."

**14**

Plaintiffs see in another code provision, Government Code section 820.21, an exception dissolving immunity for social workers whenever their discretionary decisions result in harm that plaintiffs insist was "created with intent and malice." Plaintiffs argue SSA's allegedly punitive intent in wrongly finding CRISP violations established the requisite malice.

Plaintiffs read Government Code section 820.21 too broadly. It is not a blanket exception for every conceivable act that may be done with malice. By its terms, the immunity exception in section 820.21 is limited to specific instances of misconduct, including perjury. It provides: "Notwithstanding any other provision of the law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct [child welfare] investigations or proceedings . . . shall not extend *to any of the following*, if committed with malice: [¶] (1) Perjury. [¶] (2) Fabrication of evidence. [¶] (3) Failure to disclose known exculpatory evidence. [¶] (4) Obtaining testimony by duress . . . ." (Gov. Code, § 820.21, subd. (a), italics added.) Erroneously removing a child is not among the listed actions committed with malice for which immunity is revoked.

Plaintiffs did not assert SSA workers committed perjury, fabricated evidence produced for a decisionmaker, or committed similar misconduct to end the CRISP placement and remove C.C. from mother's care. Rather, as discussed, the removal decision itself was committed with mother's assent in the CRISP agreement to SSA's discretion. SSA and its social workers therefore served as the initial decisionmakers in removing C.C. from his CRISP placement, and it makes little sense to suggest SSA committed perjury or fabricated evidence in its own removal decisionmaking process.

**15**

And there is no evidence SSA hid any evidence when the dependency court later reviewed and ratified SSA's removal and new placement decision. Rather, SSA and mother produced all pertinent evidence according to their respective burdens of proof and production, sufficient for the court to make a fully informed decision ratifying SSA's actions. Plaintiffs do not assert the trial court lacked any information to make its decision. (See *Watson v. County of Santa Clara* (N.D. Cal. 2010) 2010 WL 2077171, *9 [summary judgment proper where plaintiff failed to produce evidence defendants committed perjury or other specified acts invalidating immunity in Gov. Code, 820.21].) In any event, plaintiffs also failed to oppose summary judgment with evidence of Marks' punitive intent or malice in removing C.C. "[S]ubstantial responsive evidence is required" and they produced none. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 162-163 ["mere speculation . . . is insufficient to establish a triable issue of fact"].)

Plaintiffs appear to assert they were not required to produce any evidence beyond the bare fact SSA removed C.C. from mother's care because committing that authority to SSA's discretion "amounted to per se violations of plaintiffs' constitutional and civil rights." (Boldface and capitalization removed.) Plaintiffs invoke *Santosky*, *supra*, 455 U.S. 745, noting there the high court "clearly established the constitutional protection[] of familial bonds and the right to due process when those bonds are threatened by the government." Specifically, plaintiffs assert that vesting SSA with authority to end the CRISP placement "illegally usurped judicial authority . . . ." Plaintiffs apparently view this delegation as a per se due process violation.

Plaintiffs, however, did not assert this theory in the dependency proceedings, nor in their complaint in this civil action, nor do they provide page citations to suggest they made this argument in opposition to summary judgment. Notably,

**16**

plaintiffs declined in the dependency proceedings to seek immediate judicial review of SSA's removal decision or otherwise to modify (Welf. & Inst. Code, § 388) SSA's CRISP authority.  Plaintiffs also omitted in their civil complaint any mention of the trial court's assertedly improper delegation, and a plaintiff may not oppose summary judgment with a new unpleaded legal theory.  (*Robinson v. Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108, 1132.)  "The principles of 'theory of the trial' apply to . . . summary judgment motions" (*North Coast Business Park v Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29), and  therefore "'[a] party is not permitted to change his position and adopt a new and different theory on appeal'" (*ibid.*).  "'To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing party.' [Citation.]"  (*Ibid.*)  Instead, the pleadings define the issues to be considered on a motion for summary judgment (*Lockhart v. County of Los Angeles* (2007) 155 Cal.App.4th 289, 303), and plaintiffs did not allege improper delegation in their complaint.

In any event, plaintiffs' bid for reversal fails on the merits because the dependency court is the true target for their core claim of wrongful delegation and, as noted, the court is absolutely immune.  Furthermore, as defendants note, *Santosky* is inapposite because here mother did not have a preexisting custodial right with which SSA or the dependency court allegedly interfered in a manner violating due process.  Rather, she had lost custody in the family court proceedings before the dependency case arose, and therefore gained only provisional custody of C.C. by the terms of the CRISP release, to which she agreed.  Having agreed to the terms, including SSA's right to redetain C.C. "if it *appears* the terms and conditions . . . are violated or [the] child is at risk" (italics added), there is no conceivable merit to plaintiffs' theory of a per se constitutional

**17**

violation.  Simply put, no reasonable trier of fact could decide the matter in plaintiffs' favor, and the trial court therefore properly granted summary judgment.

## III

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.

Filed 10/29/13

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHRISTINA C. et al., | |
| Plaintiffs and Appellants, | G047805 |
| v. | (Super. Ct. No. 30-2011-00437624) |
| COUNTY OF ORANGE et al., | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION; [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

THE COURT:

The opinion filed on October 1, 2013, is modified as follows:

1. On page 2, in footnote 1, change the citation in the sentence so that it reads: "(Cal. Style Manual (4th ed. 2000) §§ 5:9, 5:10; cf. Cal. Rules of Court, rule 8.401(a).)"

2. On page 2, at the end of the first full paragraph, after the sentence that ends ". . . we therefore affirm the judgment", insert the following sentence: "In the published portion of the opinion, we explain that social

_____

\* **Pursuant to California Rules of Court, rules 8.1005(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.**

workers do not ordinarily bear liability for a juvenile court's erroneous delegation of authority and that the scope of Government Code section 820.21's malice exception to social workers' general immunity from lawsuits is limited."

3.      On page 5, change the first sentence of the second new paragraph from "Meanwhile, according to SSA, father's visits were so positive that the agency considered dispensing with a monitor" to "Meanwhile, according to SSA, father's visits were positive and the agency considered dispensing with a monitor."

4.      On page 7, in the last sentence of the first new paragraph, change "per" to "in" so that the first part of the sentence changes from "The court held that under the immunity afforded social workers per Government Code section 820.2 . . ." to "The court held that under the immunity afforded social workers in Government Code section 820.2 . . . ."

5.      On page 10, at the beginning of the first new paragraph of part II.C., delete the following sentences:  "Even overlooking plaintiffs' forfeiture, their appellate challenge fails.  The trial court did not err in granting summary judgment."

6.      On page 11, at the end of the first new paragraph of part II.C., following the sentence that ends ". . . 'legitimate custody is at issue and needs to be decided by the trier of fact in the civil case'", insert the following two new sentences:  "We disagree.  The trial court did not err in granting summary judgment."

7.      On page 13, correct the citation towards the end of the paragraph that begins "Mother suggests on appeal . . ." so that the citation reads as follows:

        (See, e.g., *Howard v. Drapkin* (1990) 222 Cal.App.3d 843, 851 ["The concept of judicial immunity is long-standing and absolute"].)

8.      On page 15, in the first sentence of footnote 3, delete the clause ", as defendants had argued," so that the sentence reads in relevant part:  "The trial court also noted that defendants appeared to be entitled to immunity under . . . ."

9.      On page 15, delete the last sentence ("Erroneously removing a child is not among the listed actions committed with malice for which immunity is revoked") in the last paragraph on the page.

10.     On page 15, after the paragraph now ending with the citation, "(Gov. Code, § 8201.21, subd. (a), italics added.)", insert the following new paragraph:

> The Legislature has not listed the malicious removal of a child as an act that would revoke a social worker's immunity. (Gov. Code, § 820.21, subd. (a).) The omission may arise from the fact that removal is ultimately the juvenile court's decision, and a social worker's interim actions are only temporary, pending ratification or rejection by the court. The listed actions vitiating immunity — perjury, fabrication of evidence, hiding exculpatory evidence, and poisoning testimony with duress — all share a common trait of subverting the juvenile court's ability to decide the removal question fairly. In any event, we may not judge the Legislature's wisdom in including some malicious acts in section 820.21, and omitting others. (*In re Marriage of Tavares* (2007) 151 Cal.App.4th 620, 628 ["The Legislature declares state public policy, not the courts"].)

11.     On page 16, in the first new paragraph, delete the second sentence, which reads "Rather, as discussed, the removal decision itself was committed with mother's assent in the CRISP agreement to SSA's discretion" and substitute the following sentence:  "Rather, as discussed, mother in the CRISP agreement committed any  initial decision to end the placement to SSA's discretion."

12.     In the last line on page 17, in the second sentence of the paragraph that begins "In any event, plaintiffs' bid for reversal fails on the merits", delete the clause ", as defendants note," so that the sentence reads in relevant part:  "Furthermore, *Santosky* is inapposite here because . . . ."

These modifications do not change the judgment.

Respondents' motion to publish the opinion is granted in part. The opinion as modified in this order is ordered published with the exception of part II.B.

ARONSON, J.

WE CONCUR:

MOORE, ACTING P. J.

IKOLA, J.