Filed 3/24/17  Modified and certified for publication 4/19/17 (orders attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

GABRIELLE A. et al.,

    Plaintiffs and Appellants,

        v.

COUNTY OF ORANGE et al.,

    Defendants and Respondents.

G051784

(Super. Ct. No. 30-2014-00701745)

O P I N I O N

Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge.  Affirmed.

Dordi Williams Cohen, Reuven L. Cohen and Anya J. Goldstein for Plaintiffs and Appellants.

Woodruff, Spradlin & Smart, Daniel K. Spradlin and Roberta A. Kraus for Defendants and Respondents.

Plaintiffs Gabrielle A. and Nicholas G. (the parents) and John A. and Gregory A. (the children) appeal from a judgment following the trial court's decision to grant a motion for summary judgment by the County of Orange (the County) and social workers Laura McLuckey, Veronica Zuniga, Sandra Parrish-Rehoreg, Lauri Luchonok, Gale Westbrook, Elvia Villa, and Brian Satterfield.

Plaintiffs' claims relate to the detention of John and Gregory for six months, specifically, the two months they were detained in Orange County before the case was transferred to Los Angeles. We conclude, as did the trial court, that the parents' knowing and voluntary pleas of no contest to the jurisdictional allegations during dependency proceedings defeats their claims, and the social workers are entitled to immunity. Finally, even if we were to disregard the no contest pleas and the relevant immunity doctrines, defendants correctly argue they met their burden to establish they were entitled to summary judgment on each cause of action, and plaintiffs failed to raise triable issues of material fact. Accordingly, we affirm.

I

FACTS

*A. Dependency Case*

In 2011, plaintiffs Gabrielle A. and Nicholas G., a married couple, were living in Los Angeles County. They were raising John who was born in July 2009, and decided to have another child. As they had done with John, they used in vitro fertilization (IVF) and a sperm donor to conceive their second child, who was due to be born in July 2011.

In May 2011, Gabrielle and John were visiting her mother, Barbara A. According to one of plaintiffs' complaints, Nicholas did not accompany her because Barbara despised him and refused to allow him into her home.[1]

Gabrielle went into early labor, and gave birth at Hoag Hospital (Hoag) to Gregory at 31 weeks. Three days later, Gabrielle was released, and she returned to Barbara's home. Gregory remained in the Neonatal Intensive Care Unit (NICU).

A few days later, Hoag employees filed a referral for an immediate response from the Orange County Social Services Agency (SSA). Hoag staff reported to Senior Social Worker Elvia Villa that Gabrielle had appeared at Hoag with John and Barbara, wearing a trench coat with nothing on underneath. She displayed what the staff characterized as irrational and aggressive behavior, including removing the trench coat and walking around unclothed. She had previously asked for Gregory to be placed back inside of her, and she asked a nurse to cut her ankles for blood letting. According to staff, she attempted to wheel Gregory's isolette out of the NICU and became violent with them.

Gabrielle disputes this version of events, stating she was attempting to pick up a fallen item, not move Gregory's isolette. But she does not dispute that she was placed on a hospital hold pending evaluation. Hospital employees informed Villa that Gabrielle had expressed thoughts of hurting her children and demonstrated paranoia.

Nicholas, meanwhile, had not yet been to visit his newborn son, although nearly a week had elapsed since his birth. He was not listed on the birth certificate as the child's father. He was not listed on hospital records. When interviewed, after being

---

[1] This statement, like many statements the plaintiffs include in their statement of facts, is supported only by a citation to plaintiffs' unverified complaint. Such statements are not evidence. Even if such facts can be found elsewhere in the record in evidentiary form, it is the responsibility of the parties, not the court, to provide such citations. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.)

placed on the hospital hold, Gabrielle had told Villa that her children were conceived through IVF using sperm donors, and she did not know who the fathers were.

Gabrielle also told Villa that she had placed her hands over Gregory "'and created a protective bubble oric shield that would keep him free of all evil.'" Villa also spoke to Barbara, who reported Gabrielle had become agitated and aggressive a few days after Gregory's birth, including abusive behavior toward her. Barbara told Villa she was not aware that Gabrielle and Nicholas were married.

Based on her interviews with Gabrielle, Barbara, numerous members of hospital staff, and the incomplete information she had received about Nicholas's paternity, Villa, with her supervisor's and law enforcement's concurrence, placed Gregory on a hospital hold and both children in protective custody. The hospital hold was signed and accepted by a nurse at Hoag. Villa also prepared applications for dependency petitions.

The next day, a Sunday, Nicholas presented a copy of his marriage certificate to Social Services Supervisor Brian Satterfield at Orangewood Children's Home (Orangewood) and asked him to release John to his custody. Satterfield was acting as duty officer that day, which meant he had responsibility for overseeing operations at Orangewood. He had no authority to release any child, and so informed Nicholas. Other than his duties at Orangewood, Satterfield had no other involvement in the case. Citing again to their complaint, Nicholas claimed Satterfield told him he did have such authority.

The detention report was authored by Laura McLuckey, a licensed clinical social worker and SSA employee. Her investigation included, in sum, the following. She spoke to Barbara, who expressed concern about Gabrielle's "'very strange ideas.'" She told McLuckey that Gabrielle chews John's food before giving it to him, and claimed a need to "'blood let'" her ankles. She characterized Nicholas as being completely

4

dependent on Gabrielle, and she repeated her accusation that Gabrielle had abused her. She was concerned for John's safety and would not allow Gabrielle to return to her home.

McLuckey also spoke to Nicholas. According to her report, he said he was not present for Gregory's birth because Gabrielle and Barbara had told him "things were fine" and requested he wait a few days. He had appointments on two days, and needed to stay home to take care of family pets. He stated he "'would do anything Barbara and [Gabrielle] want him to.'" He admitted Gabrielle is "'strong-willed'" and that he would make efforts to "'appease'" her. He acknowledged that Gabrielle chewed John's food, but said it did not happen regularly. He admitted Gabrielle's need for psychological help.

Gabrielle told McLuckey she had annulled her marriage to Nicholas due to fraud.[2] She said Nicholas had accused her of being an unfit mother. McLuckey also spoke to Hoag employees, who recounted Gabrielle's behavior and updated her as to Gregory's status. She was advised Gabrielle had been diagnosed with postpartum depression and transferred to a different hospital.

She also spoke with Veronica H., Gabrielle's sister. Veronica reported she had a good relationship with Gabrielle and stated her opinion that Gabrielle was an excellent mother, although she could be "obsessive and nervous" and that Gabrielle believed in homeopathic remedies and was extremely health conscious. Veronica stated she and her siblings had an abusive childhood due to Barbara's alcoholism and abuse. Veronica said that Nicholas provided child care for Veronica's own son. She wished to be considered for placement, if necessary.

McLuckey contacted John's pediatrician about his prior care and history, which did not raise any issues. She also received a copy of the marriage certificate between Gabrielle and Nicholas and investigated whether there were any police contacts in their city of residence.

_____

[2] Gabrielle and Nicholas did have an earlier marriage between them annulled in 1999. They were remarried in 2009.

5

The detention report also noted that a home inspection had been completed and no visible hazards or safety concerns were reported. The report also recounted an e-mail from Gale Westbrook, a senior social worker who worked in placement. Westbrook reported that on the day after detention, Nicholas had been calling SSA "non-stop since about 6:30 AM" and described him as "pushy, argumentative, and demanding to have the child. . . . He is rude, interrupts, and tries to intimidate staff by raising his voice."

Ultimately, McLuckey's report recommended the children be detained, with John placed in Nicholas's care. She also recommended Gregory be placed with Nicholas when he was released from the hospital, with certain protective orders in place. Gabrielle was not to reside in the home until her mental health was stabilized, with consistent therapy and medication; Nicholas was not to permit any unmonitored contact between Gabrielle and the children; and visits between Gabrielle and the children needed to be monitored by a designated monitor, not Nicholas. McLuckey also prepared the dependency petition. The petition cited Welfare and Institutions Code section 300, subdivision (b), failure to protect, as the basis for dependency.

The detention hearing was held on May 25, 2011 before Commissioner Jane L. Shade. Despite McLuckey's recommendation that both John and, in due course, Gregory, be returned to Nicholas's care, the children's court-appointed counsel objected. Counsel was concerned that Nicholas was "passive" and minimized Gabrielle's problems, and would not be able to handle the situation if Gabrielle turned up at the home in an erratic and unstable condition. Counsel raised Nicholas's own statement to SSA that he "'would do anything Barbara and [Gabrielle] want him to.'" Also raised was the e-mail Westbrook sent to McLuckey about Nicholas's behavior with SSA staff following detention. While counsel specified that she was not arguing the children should never be placed with Nicholas, she felt it was premature due to the lack of a safety plan. Ultimately, the court agreed and ordered the children detained. Nicholas was to have monitored visits with John.

6

In a related hearing on May 27, the court concluded that Nicholas was the presumed father of both children. The court continued its previous order, though it granted Nicholas additional visitation and allowed SSA to liberalize or restrict visitation as necessary.

There is a document in the record entitled "Orange County Social Services Agency Detention Disposition Worksheet." This document is undated and unsigned. It states, with regard to placement: "SSA is authorized to release to suitable adult (placement) pending hearing. SSA to conduct relative placement evaluation as authorized by law (SSA can consider relatives but do not place)."

At the hearing, the court stated it would authorize SSA "to release the child to a suitable adult as may be deemed pending hearing for suitable placement." The children's counsel specifically asked the court to exclude Gabrielle's relatives. The court replied: "I'm not authorizing release to a relative but just to a suitable adult for placement." Asked by Gabrielle's counsel to clarify if the court meant that relative placement was not preferred, the court answered it was not making that finding. Gabrielle's counsel then asked: "Are we considering that a relative is included in any suitable adult?" The court answered: "I'm just authorizing release to a suitable adult." Gabrielle's counsel stated she could "see confusion happening when the agency gets an order as to whether or not they can continue to consider relatives for placement," and the court responded: "As authorized by law."

Following the detention hearing, Westbrook began evaluating relatives as placement options. She completed an assessment of the home of Veronica and her husband on June 1. Westbrook's home visit revealed that Veronica, her husband and six-year-old child lived in a one-bedroom apartment, with all three sharing one bed. State regulations require each child to have their own bed or crib, and based on the size of the bedroom, Westbrook did not believe all necessary beds could be accommodated.

7

Both Veronica and her husband expressed concerns to Westbrook about Gabrielle, and how they might protect themselves if Gabrielle's mental health declined. Veronica's husband was concerned Gabrielle could overpower him and steal the children. Veronica thought they might move to a larger residence with a confidential address.

Westbrook's investigation also showed that Veronica had two unresolved criminal matters. Westbrook told Veronica that if the issues regarding required beds or cribs could be resolved, the placement recommendation would be favorable. Westbrook requested an exemption for the criminal issues.

Westbrook also did an evaluation of Barbara's home on June 8. Immediately after detention, Westbrook had ruled out Barbara because she could not protect herself from Gabrielle and was fearful of Nicholas. She also did not think she could manage the newborn.

After the detention hearing, however, Westbrook reevaluated and reconsidered. She found that Barbara had a preexisting relationship with John, and he would run to be with her during visits. Many of John's personal items were at Barbara's home. Barbara told Westbrook she could hire a nanny or helper if the children were placed with her.

Gabrielle had informed Senior Social Worker Sandra Parrish-Rehoreg that she preferred the children be placed with her and Nicholas, then with Veronica, with Barbara as her third choice. If the children were placed in foster care, she wanted the foster mother to be "a 'lactating mother into new age kind of stuff.'"

The jurisdiction/disposition report was prepared by Senior Social Worker Lauri Luchonok. The initial report was filed on June 14, with addenda filed on June 15 and 16. The report provided a comprehensive overview of the facts and issues, including reports on the many interviews Luchonok had conducted. Ultimately, Luchonok recommended the petition be sustained and the matter transferred to Los Angeles for disposition. Gabrielle argues that a psychiatrist's evaluation, dated June 13, should have

8

been discussed in the report. The evaluation concluded that Gabrielle had suffered from "post-partum psychosis due to acute stress, but symptoms resolved," and said her current diagnosis was "adjustment disorder with anxiety."

On June 15, the jurisdictional hearing before Referee Barbara Evans[3] was continued with authorization for breast feeding with approval of Gregory's doctor. After obtaining the doctor's approval, Luchonok instructed Barbara to give the breast milk to Gregory and that she needed to follow the court order. She believed Barbara was doing so. SSA was also authorized to release the children to a suitable adult.

At that same hearing, the court clarified its order concerning placement: "The agency does have the authority to release to a suitable adult and that would include, certainly, the grandmother or the aunt as is in the best interest of the children."

Westbrook approved placement of John with Barbara on June 16. It was reported to the court in an addendum to the jurisdictional report that this placement would occur. Barbara picked John up from Orangewood on June 17. On June 20, after confirming Barbara had hired a full-time nurse to help with Gregory's care, Westbrook approved placement of Gregory with Barbara.

The parties were in court again on June 16,[4] before Referee Evans. The parties had signed a written stipulation under which both Nicholas and Gabrielle pleaded no contest to an amended petition. On the record, both stated they had signed and

---

[3] Referee Evans was acting as temporary judge.

[4] During briefing, plaintiffs requested the record be augmented with the full transcripts of this hearing and a hearing held on November 10. We denied the request, stating that "only excerpts of those transcripts were attached to the motion for summary judgment which is under review in this appeal. Although the complete reporter's transcripts were transmitted to the trial court from the juvenile court proceeding . . . only the excerpts were unsealed and provided to the trial court for consideration." Accordingly, we disregard plaintiffs' discussion of any part of the hearing not included in the transcript excerpts.

9

initialed the stipulation. The court stated: "I want you both to listen. You have certain rights. This matter's been set for a trial, and I know you both know that and understand that. This document asks if you want to waive those rights." When asked if his attorney had explained the document to him, Nicholas said he understood there would be a dispositional hearing in Los Angeles, and asked if that was the same as a trial. He said the issues that had been covered did not include his rights. That part of the transcript ends at that point. A new excerpt begins a few pages later, where the court explained that a plea of no contest does not admit or deny the petition's allegations. "You're leaving it up for the court to decide, and the court has read everything in the file, so based on the information in the file, the court would find the petition is true." The court advised the parties that because they lived in Los Angeles, the case would proceed to disposition there.

Nicholas stated he felt the jurisdiction/disposition report included "a lot of false statements," and the court advised that if the matter proceeded to trial, his attorney would have the right to cross-examine the person or persons who prepared the reports. The father responded he just wanted to get his children back as quickly as possible, to which the court replied, "I don't know what the answer is to your question." Nicholas again denied any wrongdoing. The court ordered the matter off the record at that point.

When proceedings resumed, the court asked counsel if they had had the opportunity to speak with their clients. Nicholas's attorney stated she had explained, again, that the stipulation would resolve the issue of jurisdiction only, and at a disposition hearing, he would still have the right to a trial, to call witnesses, and to testify. The court then inquired of Nicholas: "The court still has concerns, based on your statements a little while ago, about the fact that you haven't had an opportunity to be heard. Nobody let you be heard. You have that right. I want you to be heard. But if you enter a plea today, you're not going to be heard, at least not on the issues of the things that are in the petition. [¶] Do you understand that?" Nicholas responded: "Yes, I do. I'm prepared to

10

go along with the petition, you honor." Nicholas agreed that this was his independent decision, and agreed again when asked if it was his "independent, intelligent decision." He also replied in the affirmative to questions asking whether he had an adequate opportunity to discuss the matter with counsel. He said he did not have any concerns or doubts, or further questions for the court. When informed he still had the right to a trial, he replied, "I understand that, your honor, but I don't feel a trial at this point will be necessary, your honor."

The court inquired next of Gabrielle. In response to the court's questions, Gabrielle agreed she understood her rights; her attorney had adequately explained her rights to her; and her attorney had answered her questions. She understood that she had the right to a trial if she disagreed with the petition, to call and cross-examine witnesses, and to testify herself. She also understood that if she entered a plea of no contest, the court would find the petition true. She wished to proceed with a plea. Her attorney concurred that Gabrielle understood her rights.

Accordingly, the court determined that each parent had knowingly and voluntarily waived his or her right to a trial and they wished to enter a plea. The parents subsequently pleaded no contest to the allegations of the amended petition, and counsel joined. The court determined there was a factual basis for the plea, and found by a preponderance of the evidence that the petition was true. The court found the children's legal residence was in the county of Los Angeles, and ordered the case transferred there, with prior orders to remain in full force and effect until disposition.

Senior Social Worker Guadalupe Arteaga was acting as court officer in the department where the jurisdictional hearing took place. As court officer, her role included preparing files for hearings, reviewing reports, and acting as liaison between the court and social services. Arteaga did not take note of the addendum report, in which Luchonok had reported that John would be placed with Barbara on the day of the hearing. She believed John was still at Orangewood. As a result, after the court ordered the case

11

transferred to Los Angeles, she followed standard practice for a child in an emergency shelter and completed a transfer order, a standard Judicial Council form that directed the child be transferred to the new county within seven days. She later testified that had she known that John was with Barbara, she would not have ordered the transfer to occur within seven days. Luchonok did not discover the transfer order until approximately a week after the hearing. Once she did, she contacted Arteaga and informed her of the issue, and consulted county counsel, who recommended that John remain with Barbara because removing him to a new foster care situation would be detrimental. Counsel informed Luchonok that in his view, moving John to Los Angeles was not required.

After this hearing, Nicholas spoke on the phone with Senior Social Services Supervisor Veronica Zuniga about the transfer of the case to Los Angeles.

Commissioner Shade, who had not presided at the jurisdictional hearing, was made aware of the issue of the transfer order at a June 27 hearing. Despite the factual situation created by the error, the court declined to amend the transfer order because the order was made by a temporary judge to whom all counsel had stipulated, and if the court were to consider new argument, it would be tantamount to an improper appeal. The children's counsel strenuously objected to removing John from Barbara's home. Nonetheless, the court did not believe it had the authority to reconsider the issue. It stated: "I hope that everyone, as lawyers, will explore any remedies that might be appropriate or discussions or whatever they may feel is appropriate and take it from there."

County counsel subsequently sent an e-mail to Luchonok advising her to transfer the case, leave the children in placement, and Los Angeles would sort it out. "The parents," counsel wrote, "are not denied any due process on the issue since the case has been transferred to LA for disposition and placement is at issue at disposition. Thus, the parents would be able to litigate this issue in Los Angeles. Also, it would likely be

12

detrimental to remove the child from this relative placement to go into congregate care in Los Angeles pending further placement by Los Angeles."

The case was transferred on July 18. Numerous proceedings were held in Los Angeles County between July and November. Gabrielle and Nicholas claim they were denied visitation through part of this period.[5] The children were removed from Barbara's care and placed with Veronica's husband, on the condition that Veronica remain out of the home until a criminal history waiver was processed. In November, the children were released to the parents upon a finding by the trial court that Nicholas "is at this point non-offending" and the testimony of Gabrielle's psychiatrist. Gabrielle was required to continue counseling and seeing her psychiatrist as recommended by her doctor.

## B. The Los Angeles/Federal Proceedings

In March 2012, plaintiffs filed a complaint (which does not appear to be included in the record) against 16 defendants (including most of the social workers named above; we will discuss this in more detail *post*) in Los Angeles Superior Court. They filed a first amended complaint on July 6. On August 8, the defendants removed

---

[5] Plaintiffs' briefs tend to cite to their separate statement as evidence of their assertions. This claim about visitation, for example, lists seven different exhibits as evidence in their separate statement. Unfortunately, rather than citing to the specific pages of the *appellate* record that include the evidence they would like us to review, they expect us to search the summary judgment exhibits, which go from A to GG in defendant's papers and from A to NNN in plaintiffs' filings. (Why plaintiffs could not have used numbers rather than letters for their exhibits is also baffling.) Given the length of the record (a 2,190-page clerk's transcript plus another 478 pages submitted in an unredacted version) it was incumbent on the parties to cite specifically to the page of the *appellate* record that included the relevant supporting evidence. To the extent we are unable to locate evidence in the record to support plaintiffs' assertions, they are disregarded and any legal issue is waived. (*Del Real v. City of Riverside*, *supra*, 95 Cal.App.4th at p. 768; *Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 109.)

the matter to federal district court. At a hearing in September, the district court, with the consent of plaintiff's counsel, dismissed a number of federal claims asserted in the first amended complaint and ordered plaintiffs to either decide to dismiss the remaining federal claims or to file a second amended complaint.

On September 24, plaintiffs filed a second amended complaint and attempted again to plead federal claims. A few days later, the district court dismissed all federal claims and remanded the matter back to state court in Los Angeles County, where plaintiffs filed a third amended complaint. This complaint, too, included federal causes of action, so defendants again removed the case to federal district court.

In January 2013, the federal court granted defendants' motion to dismiss, finding that plaintiffs had failed to allege specific facts as to each defendant on each alleged claim. Leave to amend was granted, and in February, plaintiffs filed their fourth amended complaint (the complaint). That complaint was 234 pages long, included 32 causes of action, and named, as relevant here, the following defendants: the County, McLuckey, Zuniga, Parrish-Rehoreg, Luchonok, Westbrook, Villa, and Satterfield. The topics in the complaint include everything from the original detention, to the alleged failure to follow the breast milk and visitation orders, to the handling of the transfer to Los Angeles. In sum, plaintiffs accused the County and the social workers of not merely negligent but grossly improper (and criminal) conduct, including falsifying evidence, failing to disclose exculpatory evidence, committing perjury, and acting with fraud, duress, and malice in their conduct of the case.

After rulings in the federal court on motions to dismiss, as well as voluntary dismissals, the seven individual social workers and the County were the only remaining defendants.

The County and the seven social workers brought a motion for summary judgment or partial summary judgment on eight of the federal claims, including alleged

14

violations of the First, Fourth and Fourteenth Amendments. In October 2013, the district court granted the motion in its entirety.

We briefly summarize some of the district court's pertinent findings. The court found that exigent circumstances existed to detain the children without a warrant at Hoag, and that Nicholas's arrival at Hoag after the children were detained did not alter matters; there was no evidence to show conduct by the social workers to establish a claim for deliberate indifference, or behavior that shocks the conscience; the social workers were entitled to immunity because there was no evidence of material false statements; numerous claims by the plaintiffs were barred by the parents' pleas of no contest in dependency court. The court entered judgment in favor of the defendants. The district court declined to exercise jurisdiction over the state claims and remanded the matter to state court. The matter was transferred to Orange County thereafter.

## C. The Orange County Proceedings

In April 2014, defendants filed the instant motion for summary judgment.[6] The remaining state law claims were: negligent supervision, hiring, retention and discipline (22nd cause of action); intentional infliction of emotional distress (24th cause of action); violation of state civil rights (Civ. Code, § 43)[7] (26th cause of action); violation of state civil rights (§ 52.1) (28th cause of action); and violation of state civil rights (§§ 51.7 and 52) (30th cause of action). Defendants argued many of the issues were barred by preclusion doctrines due to the district court's decision; the social workers

---

[6] Defendants sought and gained the juvenile court's permission to use records from the dependency case, filed under seal, in its motion for summary judgment. They also filed a motion in civil court to file records under seal. They filed both redacted and unredacted versions of their motion, separate statement, and exhibits. Plaintiffs did not file any of their opposition papers or exhibits under seal.

[7] All further undesignated code sections are to the Civil Code.

15

were entitled to immunity; the claims were barred by plaintiffs' no contest pleas; and there were no triable issues of fact as to the remaining claims.

In their opposition plaintiffs argued the district court's rulings had no preclusive effect; the no contest pleas were invalidated by the subsequent trial in Los Angeles; the petition to detain the children was fraudulent; the actions of various social workers were malicious; the juvenile court had determined the social workers had violated various orders concerning visits, breast milk and the case's transfer to Los Angeles; Barbara should not have been used as a placement; discretionary immunity did not apply; and there was sufficient evidence of triable issues of fact to proceed on their claims.

Defendants filed their reply papers. The hearing on the motion was continued twice, to August 27.

At the hearing, the trial court granted the motion for summary judgment. The court stated it was not applying preclusion doctrines to the district court's decision, but "does rely on the same basic legal grounds." The court went on: "Specifically, two undisputed facts defeat plaintiffs' claims. [¶] First, the vast majority of the plaintiffs' allegations are defeated by absolute immunity given to social workers under Government Code section 820.2 for child removal and placement decisions in dependency proceedings. . . . [¶] . . . [¶] [P]laintiffs' claims that defendants fabricated evidence, made false statements, and withheld exculpatory evidence fail here because of the second fact that defeats plaintiffs' claims: plaintiffs pleaded no contest to the dependency petition."

The order was subsequently entered, as was the judgment. Plaintiffs' motion for reconsideration was subsequently denied. Plaintiffs now appeal.

16

II

DISCUSSION

*A.  Basic Principles and Standard of Review*

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To prevail on the motion, a defendant must demonstrate the plaintiff's cause of action has no merit. This requirement can be satisfied by showing either one or more elements of the cause of action cannot be established or that a complete defense exists. (Code Civ. Proc., § 437c, subds. (o), (p); *Bardin v. Lockheed Aeronautical Systems Co.* (1999) 70 Cal.App.4th 494, 499-500.)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. [Fn. omitted.]" (*Id.* at p. 850.)

To meet the burden of a prima facie case, the litigant may not rely on mere "allegations or denials of [the] pleadings." (Code Civ. Proc., § 437c, subd. (p)(2); see also *Maltby v. Shook* (1955) 131 Cal.App.2d 349, 355.) Further, "After-the-fact attempts to reverse prior admissions are impermissible because a party cannot rely on contradictions in his own testimony to create a triable issue of fact. [Citations.]" (*Thompson v. Williams* (1989) 211 Cal.App.3d 566, 573-574.)

17

"'We review the trial court's decision de novo, considering all evidence the parties offered in connection with the motion . . . and the uncontradicted inferences the evidence reasonably supports.'" (*Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 148.)

*B. The No Contest Pleas*

Plaintiffs argue that the parents' no contest pleas to the question of whether the juvenile court had jurisdiction should be disregarded, because they were not entered into voluntarily or intelligently, but based on coercion and duress. This contention, however, is based on an extremely selective reading of the record.

It is certainly a fair reading of the record to say that Nicholas initially had misgivings about the plea, denying wrongdoing and stating he just wanted his children back as soon as possible. But there is no reasonable question, and no triable issue of fact, that when the court returned after a recess Nicholas agreed that pleading no contest was his independent decision, and agreed again when asked if it was his "independent, intelligent decision." The court bent over backwards to make sure Nicholas understood the import of his decision, knew he had the right to a trial, and had the opportunity to discuss the matter with counsel. He repeatedly agreed that he did. Therefore, whatever initial doubts he had, he overcame them, and the record reflects that he voluntarily agreed to plead no contest. Moreover, the record includes no doubts whatsoever as expressed by Gabrielle. We conclude the trial court properly advised the parents of their rights and met the other requirements of accepting a plea set forth in California Rules of Court, rule 5.682.

The parents claim their deposition testimony, given in this case, should be considered as evidence of what they knew and understood at the time they entered the pleas. We disagree. Self-serving testimony cannot contradict prior admissions in

18

determining a motion for summary judgment. (See *Thompson v. Williams, supra,* 211 Cal.App.3d at p. 573.)

The parents also claim they could not "'admit'" to facts that were unknown to them at the time of the plea, because they only learned of discrepancies later. The facts they pleaded to, in the amended petition, are summarized as follows: 1) That Gabrielle gave birth to Gregory at 31 weeks, and several days later, she was hospitalized at Hoag under a psychiatric hold; 2) On the day of the hold, Gabrielle attempted to remove Gregory from the NICU, despite his continued need for medical care, and Gabrielle was combative; 3) Gabrielle had unresolved mental health issues; and 4) Nicholas knew or should have known of Gabrielle's mental health issues.

Given the limited facts included in the petition it is unclear what "fabricated evidence, false statements, and withheld exculpatory evidence attendant to the jurisdictional petition," might have been unknown to the parents at the time of the plea. These were the only facts admitted, and sufficient to establish jurisdiction. Therefore, what the parents knew or did not know about the alleged misconduct of the social workers is simply not relevant to the admitted facts. They were asked (several times, in Nicholas's case) whether they wished to give up their right to cross-examine witnesses, and repeatedly answered that they did. They cannot now complain that they entered their pleas based on incomplete information. They had the opportunity to fully explore all relevant information by proceeding to trial, but voluntarily chose not to do so.

The parents also argue that their no contest pleas at the jurisdiction hearing should be disregarded because the children, under certain conditions, were returned to them at disposition. This, simply put, is a specious argument. The jurisdiction order was never set aside or vacated – indeed, the case could not have proceeded to disposition if it had been. The fact that they "prevailed" later does not result in a dismissal of the jurisdictional order. It simply results in a new order. Indeed, nothing that occurred with respect to disposition calls into question the propriety of asserting jurisdiction. The court

19

simply found, five months later, that the children could be released, because Nicholas was nonoffending "at [that] point," and the testimony of Gabrielle's psychiatrist provided evidence that the children could be safely returned at that time.

Having addressed the facts behind the no contest pleas and determining the pleas were valid, we now turn to their legal import. "A plea of 'no contest' to allegations under [Welfare and Institutions Code] section 300 at a jurisdiction hearing admits all matters essential to the court's jurisdiction over the minor. Accordingly, by their knowing and voluntary acquiescence to the allegations of the petition, parents waived their right to challenge on appeal the legal applicability of [Welfare and Institutions Code] section 300[, subdivision] (e)[,] to their conduct." (*In re Troy Z.* (1992) 3 Cal.4th 1170, 1181.) This principle also applies in later proceedings, such as moving to reconsider the earlier finding. (*In re Andrew A.* (2010) 183 Cal.App.4th 1518, 1526-1527.)

Accordingly, the no contest pleas act as a bar to subsequently calling into question the basis for jurisdiction. Plaintiffs' claims are fundamentally premised on their assertions that the children were wrongfully removed, detained, and subjected to the jurisdiction of the juvenile court based on the alleged intentional misconduct of the social workers. But given that their pleas admitted sufficient evidence for the court to exercise that jurisdiction, these arguments are simply untenable.

## C. Immunity

In addition to the conclusion that plaintiffs cannot argue an insufficient factual basis for detention or jurisdiction, immunity doctrines bar plaintiffs' claims. These immunity doctrines are codified in Government Code sections 815.2 and 820.2.

Government Code section 820.2 states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him,

20

whether or not such discretion be abused." Similarly, Government Code section 815.2, subdivision (b), provides: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

The immunity provided by these statutes is broad, and includes immunity for social workers' removal and placement decisions. (See, e.g., *Christina C. v. County of Orange* (2013) 220 Cal.App.4th 1371, 1381 (*Christina C.*); *Jacqueline T. v. Alameda County Child Protective Services* (2007) 155 Cal.App.4th 456, 466.) Immunity "applies even to 'lousy' decisions in which the worker abuses his or her discretion, including decisions based on 'woefully inadequate information.' [Citation.]" (*Christina C.*, *supra*, 220 Cal.App.4th at p. 1381.) Courts have determined immunity applies to such decisions no matter how horrible the outcome, including a situation where a social worker returned a child to a father, who stabbed the child in the heart and lungs shortly thereafter. (*Ortega v. Sacramento County Dept. of Health & Human Services* (2008) 161 Cal.App.4th 713, 715-716-718.)

Plaintiffs argue, however, that Government Code section 820.21 applies here. That section abrogates immunity for perjury, fabrication of evidence, failure to disclose known exculpatory evidence, or obtaining testimony by duress, fraud, or undue influence – if committed with malice. (Gov. Code, § 820.21, subd. (a).) Malice is defined as "conduct that is intended by the person described in subdivision (a) to cause injury to the plaintiff or despicable conduct that is carried on by the person described in subdivision (a) with a willful and conscious disregard of the rights or safety of others." (Gov. Code, § 820.21, subd. (b).) Thus, not only must the act fall into one of the enumerated categories, but it must also be committed with malice. This is a high bar to clear, and plaintiffs' attempts to do so fail.

Plaintiffs point to numerous acts by the various social workers involved as evidence that immunity should not apply under the limits of Government Code section

21

820.21. The assertions plaintiffs offer in support of this argument, however, are purely speculative and conclusory. For example, they assert Villa took John into custody even though she knew Nicholas was present. They do not cite to specific evidence in the appellate record. Instead, they cite to their own opposition to the motion for summary judgment and nine pages of their own separate statement. That portion of the separate statement, in turn, cites literally dozens of pieces of evidence. (See fn. 5.) None of the cited evidence, including and particularly the excerpts from her deposition, supports a conclusion or even a reasonable inference of malice on Villa's part.

Plaintiffs also claim that Villa "fraudulently changed the information on the Applications for Petitions" to make it seem that Nicholas was not the father or a viable placement option. But neither the applications themselves nor Villa's testimony support any inference of malice. There was no evidence that Villa knew of Nicholas's status at the time. At best, there is evidence of a lack of information and confusion.

The purported evidence of malice against the other social workers is equally weak. Plaintiffs make much of Luchonok withholding the "exculpatory evidence" of a report by Gabrielle's psychiatrist, with no mention as to why Gabrielle's own counsel did not already have a copy of that same report. Moreover, Luchonok testified at her deposition that by the time she received the psychiatrist's report, her own report to the court had already been written. Even if Luchonok had received the report before the continued hearing, this is not evidence of malice. The psychiatrist's report was dated the day before Luchonok's report was filed.

In short, the plaintiffs' evidentiary assertions are heavy on speculation and light on facts, and plaintiff offers no argument at all as to why Government Code section 820.21 should apply to most of the social workers. Indeed, plaintiffs have failed to establish a triable issue of material fact on this point as to any of the social workers. The claims of malice are particularly unpersuasive given that on behalf of SSA, the detention report (written by McLuckey) recommended returning John, and Gregory, when possible,

22

to Nicholas at the detention hearing. It would seem that plaintiffs' real complaint is with the dependency court, not with the social workers. Overall, plaintiffs' evidence establishes only that bureaucracies sometimes fail to communicate and make mistakes. Nothing they offer rises to the level of malice as defined by the statute.

Plaintiffs' legal arguments are equally unavailing. They cite to *Elton v. County of Orange* (1970) 3 Cal.App.3d 1053, to argue the court should not have applied the immunity doctrine. But that case was heard at the demurrer stage, where courts must assume properly pleaded facts are true. That is not the case on a motion for summary judgment.

Plaintiffs also try to squeeze this case into the box of "administrative acts implementing policy decisions" which are not entitled to immunity. (See, e.g., *Barner v. Leeds* (2000) 24 Cal.4th 676.) But it is clear from case law that decisions relating to the removal, detention and placement of children in the foster care system do not fall into that category. (See, e.g., *Christina C.*, *supra*, 220 Cal.App.4th at p. 1381; see also *Becerra v. City of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1464.) Because the social workers are not individually liable, the County, too, has no liability. (Gov. Code, § 815.2.)

The law does not grant immunity to social workers because it believes they are perfect, or should never be questioned or called to account for their actions. The law grants them immunity because otherwise they would simply not be able to do their jobs. If every time they removed a child, based on the information they had at the time, they had to fear a meritorious lawsuit if they were later proved wrong, the system would be paralyzed and children would be in danger. Nor would we ever find qualified people willing to become social workers under such conditions. Here, while there is some evidence of confusion and miscommunication, none of it rises to the level of malice or even incompetence. The social workers deserve the immunity the law provides.

23

*D.  Independent Grounds for Summary Judgment*

Finally, in addition to immunity and the no contest pleas, defendants successfully demonstrated the plaintiffs' claims have no merit, thereby providing separate and independent grounds for granting summary judgment.  (Code Civ. Proc., § 437c, subds. (o), (p).)  While not discussed in the trial court's ruling, we may uphold the decision of the trial court to grant summary judgment if it is correct on any ground.  (*Schubert v. Reynolds*, *supra*, 95 Cal.App.4th at pp. 109-110.)

Plaintiffs do not discuss these issues in either of their briefs, despite defendants briefing them at some length.  While we could deem this failure to brief as conceding the issue, in the interests of justice, we consider the arguments on their merits, referring to plaintiffs' opposition to the motion for summary judgment in the trial court as appropriate.

With respect to the claims for negligent supervision, hiring, retention and discipline, plaintiffs cite no statutory basis for bringing this claim against the County, and actions against public entities must be based on a statute.  (Gov. Code, § 815.)  With respect to the individual social workers, plaintiffs do not include an argument in either of their briefs on appeal with respect to this issue.  Below, their opposition to the motion for summary judgment included two paragraphs on this point, simply asserting that because some of the social workers were supervisors there was negligent supervision, hiring, retention and discipline.  Plaintiffs argued that Satterfield, supervised by Westbrook, would not return John to Nicholas after detention despite his presentation of a marriage certificate.  This proves nothing, however, because plaintiffs have not established that Satterfield had the authority to release any child as a legal matter.[8]  Plaintiffs then simply

---

[8] They rely, instead, on a purported statement by Satterfield to Nicholas.  This does not establish legal authority to release the child, and they offer no legal argument or evidence suggesting Satterfield had such authority.

asserted other social workers "engaged in a variety of wrongdoings," but even if that were true, that does not establish negligent supervision, hiring, retention and discipline.

Indeed, what defendants' evidence showed that none of the named social workers have records of discipline, all were hired according to established procedures, and they have each completed all relevant training. Many had years or decades of experience.[9] Most of the social workers did not have supervision, hiring, retention and discipline over the other social workers in this matter.

Zuniga was Luchonok's supervisor, but her involvement in this matter was "limited to discussing the matter with her and possibly reviewing her reports prior to their submission to the Juvenile Court." Given Luchonok's experience, prior record and training, Zuniga had no reason to doubt her competence.

Given that a claim for negligence in this context requires evidence the employer was aware of a risk of harm to third parties, the evidence demonstrated no triable issue of fact as to negligent hiring, supervision, training or retention. (See *Federico v. Superior Court* (1997) 59 Cal.App.4th 1207, 1213-1215.)

With regard to plaintiffs' claim for intentional infliction of emotional distress, for the reasons we discussed above with regard to the malice requirement of immunity, the evidence is similarly deficient. "'[T]o state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the

_____

[9] Villa had worked for SSA since 2004, and had been in her assignment since 2007; McLuckey, a licensed clinical social worker, received her degree in 1999 and had been employed by SSA since 1997; Luchonok, who had a master's degree in social welfare, had been working in social services for approximately 30 years and for the County since 1999; Westbrook also had approximately 30 years of experience in social services and had worked for the County since 1989; Parrish-Rehoreg had a master's degree in counseling and was a licensed marriage and family therapist who had worked for the County since 1997; Zuniga was a licensed clinical social worker who had been employed by the County since 1997; Satterfield had been employed by the County since 1996 and had received several promotions to the position of Social Service Supervisor I.

25

probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' [Citation.]" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1259.)

Plaintiffs' argument on this point in their opposition to the motion for summary judgment (again, they declined to brief these points on appeal) consists of a paragraph conclusorily stating that the social workers "certainly acted outrageously." They cited no specific evidence, but merely referred to facts contained in six other legal arguments. They do not even cite to evidence that plaintiffs suffered the severe emotional distress required, but state it "can be reasonably inferred." Indeed, it cannot. "[I]t is not enough in opposing summary judgment to surmise reasons or make unfounded allegations: 'a party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. . . ."'" [Citation.]" (*Christina C.*, *supra*, 220 Cal.App.4th at p. 1379.) Plaintiffs did not demonstrate a triable issue of fact as to this cause of action.

Plaintiffs have no better luck with their arguments under state civil rights statutes. Section 43[10] codifies causes of action for false imprisonment, assault, battery, invasion of privacy, and a number of business torts. Plaintiffs argued below that this section creates a separate cause of action for "personal insult" or "injury to his personal relations," but they cite no authority that supports this contention. (See *Christina C.*, *supra*, 220 Cal.App.4th at p. 1383.) Moreover, instead of offering evidence of harm, plaintiffs argued that injury under this section could be "reasonably inferred." Again, we

---

[10] This statute states: "Besides the personal rights mentioned or recognized in the Government Code, every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his personal relations." (§ 43.)

disagree. Plaintiffs have failed to demonstrate a triable issue of material fact exists with respect to this claim.

Plaintiffs' remaining causes of action are under the Bane Act (§ 52.1) and the Ralph Act (§§ 51.7, 52). The Bane Act prohibits interfering "by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." (§ 52.1, subd. (a).) "Speech alone is not sufficient to support an action . . ., except upon a showing that the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence had the apparent ability to carry out the threat." (§ 52.1, subd. (j).)

The Ralph Act is an anti-discrimination scheme. Section 52, subdivision (a), states: "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages. . . ." Section 51, subdivision (b), is the Unruh Act, California's basic anti-discrimination statute, forbidding bias based on "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status." Sections 51.5 and 51.6 prohibit, respectively, boycotts or blacklists based on protected characteristics as described in the Unruh Act and gender-based pricing, respectively. Section 51.7, subdivision (a), states that everyone in California has "the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The

27

identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive."

There is no evidence that either statute has any relevance to this matter. "The Bane Act and related statutes 'are California's response to [the] alarming increase in hate crimes.' . . . Civil Code section 52.1 provides that a person may bring a cause of action 'in his or her own name and on his or her own behalf' against anyone who 'interferes by threats, intimidation or coercion, with the exercise or enjoyment' of any constitutional or statutory right." (*Bay Area Rapid Transit Dist. v. Superior Court* (1995) 38 Cal.App.4th 141, 144.) "[T]o state a cause of action under section 52.1 there must first be violence or intimidation by threat of violence. Second, the violence or threatened violence must be due to plaintiff's membership in one of the specified classifications set forth in Civil Code section 51.7 or a group similarly protected by constitution or statute from hate crimes." (*Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 111.) Plaintiffs do not even allege violence, and therefore the Bane Act claim must fail.

Under the Ralph Act, a plaintiff must establish the defendant threatened or committed violent acts against the plaintiff or their property, and a motivating reason for doing so was a prohibited discriminatory motive, or that plaintiff aided, incited, or conspired in the denial of a protected right. (See CACI No. 3063; *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 880-881.) Again, plaintiffs allege no violent act, arguing defendants "conspired" against them due to their "medical conditions." Once again, they offer no evidence to establish defendants discriminated against them, but claim "quite possibly" this animus should be inferred. We decline to substitute speculation for evidence, and find no triable issue of material fact as to this cause of action.

We conclude defendants met their burden to establish a complete defense or missing element of each of plaintiffs' claims, and plaintiffs failed to demonstrate triable

issues of material facts as to any of these causes of action. Accordingly, even if plaintiffs had prevailed in their arguments with respect to immunity and the no contest pleas, summary judgment was, nonetheless, properly granted in defendants' favor.

## III

## DISPOSITION

The judgment is affirmed. Defendants are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

29

Filed 4/18/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GABRIELLE A. et al., | |
| Plaintiffs and Appellants, | G051784 |
| v. | (Super. Ct. No. 30-2014-00701745) |
| COUNTY OF ORANGE et al., | ORDER GRANTING REQUEST FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| Defendants and Respondents. | |

Respondents have requested that our opinion filed on March 24, 2017, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GABRIELLE A. et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>COUNTY OF ORANGE et al.,<br><br>    Defendants and Respondents. | G051784<br><br>(Super. Ct. No. 30-2014-00701745)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

        This court hereby orders that the opinion filed herein on March 24, 2017, be modified as follows:

        1.  On page 23, third sentence of the last full paragraph, the word "meritorious" is deleted so the sentence reads:

        "If every time they removed a child, based on the information they had at the time, they had to fear a lawsuit if they were later proved wrong, the system would be paralyzed and children would be in danger."

This modification does not change the judgment.



MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.